# BROWN v. HARTLAGE

No. 80–1285. Argued January 20, 1982—Decided April 5, 1982

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-
SHALL, BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined.
BURGER, C. J., concurred in the judgment.  REHNQUIST, J., filed an opin-
ion concurring in the result, *post,* p. 62.

*Fred M. Goldberg* argued the cause for petitioner.  With
him on the briefs was *Jonathan D. Goldberg.*

*L. Stanley Chauvin, Jr.,* by invitation of the Court, 454
U. S. 936, argued the cause and filed a brief as *amicus curiae*
in support of the judgment below.

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is whether the First Amendment,
as applied to the States through the Fourteenth Amendment,

prohibits a State from declaring an election void because the victorious candidate had announced to the voters during his campaign that he intended to serve at a salary less than that "fixed by law."

## I

This case involves a challenge to an application of the Kentucky Corrupt Practices Act. The parties were opposing candidates in the 1979 general election for the office of Jefferson County Commissioner, "C" District. Petitioner, Carl Brown, was the challenger; respondent, Earl Hartlage, was the incumbent.[1] On August 15, 1979, in the course of the campaign, Brown held a televised press conference together with Bill Creech, the "B" District candidate on the same party ticket. Brown charged his opponent with complicity in a form of fiscal abuse:

"There are . . . three part-time county commissioners. With state law limiting their authority and responsibility to legislation . . . , it is clear that their jobs are simply not worth $20,000 a year each. It is ludicrous that the part-time commissioners nevertheless see fit to pay themselves the same amount as that paid the full-time county judge. The mere fact that state law allows such outrageous levels of remuneration does not in itself justify those payments. . . . At a fiscal court meeting in 1976, Hartlage led a surprise move to . . . more than double the salaries of the county commissioners! His actions demonstrated his unmistakable disrespect for the office of the chief executive of this county and his utter disdain for the spirit of laws that govern our county system. . . . [U]sing the gray fringes of the law for his

---

[1] Although respondent filed a brief in opposition to the petition for writ of certiorari, he did not file a brief on the merits. At the invitation of the Court, L. Stanley Chauvin, Jr., Esq., submitted a brief and argued in support of the judgment below as *amicus curiae.*

own personal gain, Hartlage led the move to funnel county tax dollars into commissioners' pockets." App. 1–2.

On behalf of himself and his running mate, Creech pledged the taxpayers some relief:

"We abhor the commissioners' outrageous salaries. And to prove the strength of our convictions, one of our first official acts as county commissioners will be to lower our salary to a more realistic level. We will lower our salaries, saving the taxpayers $36,000 during our first term of office, by $3,000 each year." *Id.*, at 2.[2]

Shortly after the press conference, Brown and Creech learned that their commitment to lower their salaries arguably violated the Kentucky Corrupt Practices Act. On August 19, 1979, they issued a joint statement retracting their earlier pledge:

"We are men enough to admit when we've made a mistake.

"We have discovered that there are Kentucky court decisions and Attorney General opinions which indicate that our pledge to reduce our salaries if elected may be illegal.

.        .        .        .        .

". . . [W]e do hereby formally rescind our pledge to reduce the County Commissioners' salary if elected and in-

---

[2] Brown echoed his running mate's call for fiscal restraint:

". . . These two proposals—cutting our own salaries and reorganizing the commissioner's office staff, will save the taxpayers over $172,000 during our term of office.

"We make these statements fully aware that the office we intend to occupy should set the tone for the type of public officials we intend to be.

"Under our guidance, extravagance of public expense will be a thing of the past, and responsibility and integrity will be our watchwords, Progress through Cooperation our theme." App 3.

stead pledge to seek corrective legislation in the next session of the General Assembly, to correct this silly provision of State Law." *Id.*, at 4–5.

In the November 6, 1979, election, Brown defeated Hartlage by 10,151 votes.[3]  Creech was defeated.

Hartlage then filed this action in the Jefferson Circuit Court, alleging that Brown had violated the Corrupt Practices Act and seeking to have the election declared void and the office of Jefferson County Commissioner, "C" District, vacated by Brown.  Section 121.055, upon which Hartlage based his claim, provides:

"Candidates prohibited from making expenditure, loan, promise, agreement, or contract as to action when elected, in consideration for vote.—No candidate for nomination or election to any state, county, city or district office shall expend, pay, promise, loan or become pecuniarily liable in any way for money or other thing of value, either directly or indirectly, to any person in consideration of the vote or financial or moral support of that person.  No such candidate shall promise, agree or make a contract with any person to vote for or support any particular individual, thing or measure, in consideration for the vote or the financial or moral support of that person in any election, primary or nominating convention, and no person shall require that any candidate make such a promise, agreement or contract."  Ky. Rev. Stat. § 121.055 (1982).[4]

---

[3] Hartlage received a total of 83,675 votes; Brown received 93,826 votes. Certificate of Election, *id.*, at 7.

[4] In 1980, the provision was amended to replace the word "demand" in the last clause with the word "require."  1980 Ky. Acts, ch. 292, § 3.

Under Kentucky law, an equity action to contest an election may be maintained by any candidate who received more than 25% of the number of votes that were cast for the successful candidate.  Ky. Rev. Stat. §§ 120.155, 120.165 (1982).  The Kentucky Corrupt Practices Act identifies a violation of § 121.055 as a proper basis for such a contest, and provides

In *Sparks* v. *Boggs*, 339 S.W. 2d 480 (1960), the Kentucky Court of Appeals held that candidates' promises to serve at yearly salaries of $1, and to vote to distribute the salary savings to specified charitable organizations, violated the Corrupt Practices Act where the salaries had been "fixed by law." In the instant case, the trial court found that Brown's prospective salary had been fixed by law and that, under the reasoning of *Sparks*, Brown's promise violated the Act. Nevertheless, the court concluded that in light of Brown's retraction, the defeat of his running mate, who had joined in the pledge, and the presumption that the will of the people had been revealed through the election process, Brown had been "fairly elected." App. 25. It thus declined to order a new election. *Id.*, at 26.

The Kentucky Court of Appeals reversed. 618 S. W. 2d 603. That court agreed with the Circuit Court that the salary of County Commissioners was fixed by law,[5] and that Brown's statement was proscribed by § 121.055 as construed in *Sparks* v. *Boggs*, *supra*.[6] The Court of Appeals also held, however, that the trial court had erred in failing to order a new election. App. 34–35. It held that retraction of the of-

---

that "[i]f no such violation [of the Corrupt Practices Act] by the contestant, or by others in his behalf with his knowledge, appears, and it appears that such provisions have been violated by the contestee or by others in his behalf with his knowledge, the nomination or election of the contestee shall be declared void." Ky. Rev. Stat. § 120.015 (1982).

[5] The Court of Appeals noted that under Kentucky law, "salaries for county officers elected by popular vote shall be set by the fiscal court 'not later than the first Monday in May in the year in which the officers are elected, and the compensation of the officer shall not be changed during the term. . . .' Brown promised to do an act that he could not legally do." App. 32–33 (quoting Ky. Rev. Stat. § 64.530(4) (1980)). See Ky. Const. §§ 161, 246.

[6] The court quoted the following extract from *Sparks*, describing the rationale underlying the statute's application to statements such as Brown's:

" ' "An agreement by a candidate for office that if chosen he will discharge the duties of the office without compensation or for a lesser compensation than that provided by law, or will pay part of his salary into the public treasury, is illegal, whether made in good faith or not. The under-

fending statement was "of no consequence under the law of this state," *id.*, at 35, and that the trial court was mistaken in believing that it possessed the discretionary authority to balance the gravity of the violation against the disenfranchisement of the electorate that would result from declaring the election void, *ibid.* With respect to Brown's First Amendment claims, the court was of the view that "[t]o hold that promises to serve at reduced compensation in violation of the Corrupt Practices Act are immune from regulation in view of the provisions of the United States Constitution is to open the door to arguments that other statements in violation of the Corrupt Practices Act are protected because they involve speech and self-expression." *Id.*, at 36. The court quoted approvingly the maxims that "[a] state may punish those who abuse the constitutional freedom of speech by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, or disturb the public peace," and that "[i]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." *Id.*, at 36–37, quoting 16A Am. Jur. 2d, Constitutional Law §§ 409, 507 (1979). The court then concluded that Brown's "statement was not constitutionally protected." App. 37.

In an opinion denying petitioner's motion for rehearing, the court more pointedly addressed petitioner's First Amendment arguments. The court found that the State's interest in the fairness and integrity of its elections was compelling,

---

lying principle . . . is that when a candidate offers to discharge the duties of an elective office for less than the salary fixed by law, a salary which must be paid by taxation, he offers to reduce pro tanto the amount of taxes each individual taxpayer must pay, and thus makes an offer to the voter of pecuniary gain" [quoting 43 Am. Jur., Public Officers § 374, p. 159 (1942)].

" 'It appears to us there can be no escape from the conclusion that a promise to take a reduction in the salary set by law for an elective public office, or an agreement to discharge the duties of the office gratis, advanced by one to induce votes for his candidacy, is so vicious in its tendency as to constitute a violation of the Corrupt Practices Act.' " App. 33.

and that the State could insist that elections be conducted free of corruption and bribery. *Id.*, at 39. The court restated its view that under the laws of the State a promise such as Brown's was considered an attempt to buy votes or to bribe the voters. *Ibid.* Finally, the court rejected petitioner's argument that § 121.055, as construed by *Sparks, supra,* was "unconstitutionally broad." Although the court found some appeal in Brown's argument that "[i]f carried to its logical extreme . . . any promise by a candidate to increase the efficiency and thus lower the cost of government might likewise be considered as an attempt to buy votes," the court was of the view that *Sparks* controlled its disposition and suggested to petitioner that he seek reconsideration of that decision in the Supreme Court of Kentucky. App. 39–40. The Supreme Court of Kentucky denied review. *Id.*, at 41. We granted the petition for certiorari. 450 U. S. 1029 (1981).

## II

We begin our analysis of § 121.055 by acknowledging that the States have a legitimate interest in preserving the integrity of their electoral processes. Just as a State may take steps to ensure that its governing political institutions and officials properly discharge public responsibilities and maintain public trust and confidence, a State has a legitimate interest in upholding the integrity of the electoral process itself. But when a State seeks to uphold that interest by restricting speech, the limitations on state authority imposed by the First Amendment are manifestly implicated.

At the core of the First Amendment are certain basic conceptions about the manner in which political discussion in a representative democracy should proceed. As we noted in *Mills* v. *Alabama,* 384 U. S. 214, 218–219 (1966):

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.

This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."

The free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy—the political campaign. "[I]f it be conceded that the First Amendment was 'fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 271–272 (1971) (citation omitted). The political candidate does not lose the protection of the First Amendment when he declares himself for public office. Quite to the contrary:

"The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandeis' observation that in our country 'public discussion is a political duty,' *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (concurring opinion), applies with special force to candidates for public office." *Buckley* v. *Valeo*, 424 U. S. 1, 52–53 (1976) *(per curiam)*.

When a State seeks to restrict directly the offer of ideas by a candidate to the voters, the First Amendment surely requires that the restriction be demonstrably supported by not

only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression.

## III

On its face, § 121.055 prohibits a candidate from offering material benefits to voters in consideration for their votes, and, conversely, prohibits candidates from accepting payments in consideration for the manner in which they serve their public function. *Sparks* v. *Boggs*, 339 S. W. 2d 480 (1960), placed a not entirely obvious gloss on that provision with respect to candidate utterances concerning the salaries of the office for which they were running, by barring the candidate from promising to reduce his salary when that salary was already "fixed by law." We thus consider the constitutionality of § 121.055 with respect to the proscription evident on the face of the statute, and in light of the more particularized concerns suggested by the *Sparks* gloss. We discern three bases upon which the application of the statute to Brown's promise might conceivably be justified: first, as a prohibition on buying votes; second, as facilitating the candidacy of persons lacking independent wealth; and third, as an application of the State's interests and prerogatives with respect to factual misstatements. We consider these possible justifications in turn.

## A

The first sentence of § 121.055 prohibits a political candidate from giving, or promising to give, anything of value to a voter in exchange for his vote or support. In many of its possible applications, this provision would appear to present little constitutional difficulty, for a State may surely prohibit a candidate from buying votes. No body politic worthy of being called a democracy entrusts the selection of leaders to a process of auction or barter. And as a State may prohibit the giving of money or other things of value to a voter in exchange for his support, it may also declare unlawful an agree-

ment embodying the intention to make such an exchange. Although agreements to engage in illegal conduct undoubtedly possess some element of association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment. The fact that such an agreement necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech. Finally, while a solicitation to enter into an agreement arguably crosses the sometimes hazy line distinguishing conduct from pure speech, such a solicitation, even though it may have an impact in the political arena, remains in essence an invitation to engage in an illegal exchange for private profit, and may properly be prohibited. See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 496 (1982); *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n*, 447 U. S. 557, 563–564 (1980); *Pittsburgh Press Co.* v. *Human Relations Comm'n*, 413 U. S. 376, 388 (1973).

It is thus plain that *some* kinds of promises made by a candidate to voters, and *some* kinds of promises elicited by voters from candidates, may be declared illegal without constitutional difficulty. But it is equally plain that there are constitutional limits on the State's power to prohibit candidates from making promises in the course of an election campaign. Some promises are universally acknowledged as legitimate, indeed "indispensable to decisionmaking in a democracy," *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 777 (1978); and the "maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means . . . is a fundamental principle of our constitutional system." *Stromberg* v. *California*, 283 U. S. 359, 369 (1931). Candidate commitments enhance the accountability of government officials to the people whom they represent, and assist the voters in predicting the effect

of their vote. The fact that some voters may find their self-interest reflected in a candidate's commitment does not place that commitment beyond the reach of the First Amendment. We have never insisted that the franchise be exercised without taint of individual benefit; indeed, our tradition of political pluralism is partly predicated on the expectation that voters will pursue their individual good through the political process, and that the summation of these individual pursuits will further the collective welfare.[7] So long as the hoped-for personal benefit is to be achieved through the normal processes of government, and not through some private arrangement, it has always been, and remains, a reputable basis upon which to cast one's ballot.

It remains to determine the standards by which we might distinguish between those "private arrangements" that are inconsistent with democratic government, and those candidate assurances that promote the representative foundation of our political system. We hesitate before attempting to formulate some test of constitutional legitimacy: the precise nature of the promise, the conditions upon which it is given, the circumstances under which it is made, the size of the audience, the nature and size of the group to be benefited, all might, in some instance and to varying extents, bear upon the constitutional assessment. But acknowledging the difficulty of rendering a concise formulation, or recognizing the possibility of borderline cases, does not disable us from identifying cases far from any troublesome border.

It is clear that the statements of petitioner Brown in the course of the August 15 press conference were very different

---

[7] See The Federalist No. 10. The Madisonian democratic tradition extolled a system of political pluralism in which "the private interest of every individual may be a sentinel over the public rights." The Federalist No. 51, p. 324 (H. Lodge ed. 1888). But it was also contemplated within that tradition that the individual may perceive his interest as according with the public good: "In the extended republic of the United States, and among the great variety of interests, parties and sects which it embraces, a coalition of a majority of the whole society could seldom take place on any other principles than those of justice and the general good." Id., at 327.

in character from the corrupting agreements and solicitations historically recognized as unprotected by the First Amendment. Notably, Brown's commitment to serve at a reduced salary was made openly, subject to the comment and criticism of his political opponent and to the scrutiny of the voters. We think the fact that the statement was made in full view of the electorate offers a strong indication that the statement contained nothing fundamentally at odds with our shared political ethic.

The Kentucky Court of Appeals analogized Brown's promise to a bribe. But however persuasive that analogy might be as a matter of state law, there is no *constitutional* basis upon which Brown's pledge to reduce his salary might be equated with a candidate's promise to pay voters for their support from his own pocketbook. Although upon election Brown would undoubtedly have had a valid claim to the salary that had been "fixed by law," Brown did not offer the voters a payment from his personal funds. His was a declaration of intention to exercise the fiscal powers of government office within what he believed (albeit erroneously) to be the recognized framework of office. At least to outward appearances, the commitment was fully in accord with our basic understanding of legitimate activity by a government body. Before any implicit monetary benefit to the individual taxpayer might have been realized, public officials—among them, of course, Brown himself—would have had to approve that benefit in accordance with the good faith exercise of their public duties. Although Brown may have been incorrect in suggesting that his salary could have been lawfully reduced, this cannot, in itself, transform his promise into an invitation to engage in a private and politically corrupting arrangement.

In addition, despite the Kentucky courts' characterization of the promise to serve at a reduced salary as an offer "to reduce pro tanto the amount of taxes each individual taxpayer must pay, and thus . . . an offer to the voter of pecuniary gain," App. 33, it is impossible to discern in Brown's general-

ized commitment any invitation to enter into an agreement that might place the statement outside the realm of unequivocal protection that the Constitution affords to political speech. Not only was the source of the promised benefit the public fisc, but that benefit was to extend beyond those voters who cast their ballots for Brown, to all taxpayers and citizens. Even if Brown's commitment could in some sense have been deemed an "offer," it scarcely contemplated a particularized acceptance or a *quid pro quo* arrangement. It was to be honored, "if elected"; it was conditioned not on any particular vote or votes, but entirely on the *majority's* vote.

In sum, Brown did not offer some private payment or donation in exchange for voter support; Brown's statement can only be construed as an expression of his intention to exercise public power in a manner that he believed might be acceptable to some class of citizens. If Brown's expressed intention had an individualized appeal to some taxpayers who felt themselves the likely beneficiaries of his form of fiscal restraint, that fact is of little constitutional significance. The benefits of most public policy changes accrue not only to the undifferentiated "public," but more directly to particular individuals or groups. Like a promise to lower taxes, to increase efficiency in government, or indeed to increase taxes in order to provide some group with a desired public benefit or public service, Brown's promise to reduce his salary cannot be deemed beyond the reach of the First Amendment, or considered as inviting the kind of corrupt arrangement the appearance of which a State may have a compelling interest in avoiding. See *Buckley* v. *Valeo*, 424 U. S., at 27.

A State may insist that candidates seeking the approval of the electorate work within the framework of our democratic institutions, and base their appeal on assertions of fitness for office and statements respecting the means by which they intend to further the public welfare. But a candidate's promise to confer some ultimate benefit on the voter, *qua* tax-

payer, citizen, or member of the general public, does not lie beyond the pale of First Amendment protection.

B

*Sparks* v. *Boggs*, 339 S. W. 2d 480 (1960), relied in part on the interest a State may have in ensuring that the willingness of some persons to serve in public office without remuneration does not make gratuitous service the *sine qua non* of plausible candidacy.[8]  The State might legitimately fear that such emphasis on free public service might result in persons of independent wealth but less ability being chosen over those who, though better qualified, could not afford to serve

---

[8] As explained by the Kentucky Court of Appeals:

"To hold otherwise would permit the various elective public offices to become filled by those who would purchase their election thereto by making the most extravagant bid.   The auction method of choosing a public officer would supplant the personal fitness test.   Eventually most of the public offices would be occupied by the opulent, who could afford to serve without pay, or by the ambitious, who would serve only for the pittance of honor attached to the office, or by the designing grafter, who would surely obtain his remuneration by methods which would not bear scrutiny.   Under such a system good government would certainly vanish from every subdivision of the state."   339 S. W. 2d, at 484.

Other courts have expressed similar views.   For example, *Sparks* quoted with approval the following passage from the opinion of Justice Brewer of the Supreme Court of Kansas, later Justice Brewer of this Court, in *State ex rel. Bill* v. *Elting*, 29 Kan. 397, 402 (1883):

" 'The theory of popular government is that the most worthy should hold the offices.   Personal fitness—and in that is included moral character, intellectual ability, social standing, habits of life, and political convictions— is the single test which the law will recognize.   That which throws other considerations into the scale, and to that extent tends to weaken the power to personal fitness, should not be tolerated.   It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot.   It is in spirit at least, bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voter.' "   339 S. W. 2d, at 483–484.

See also *State ex rel. Clements* v. *Humphreys*, 74 Tex. 466, 12 S. W. 99 (1889).

at a reduced salary. But if § 121.055 was designed to further this interest, it chooses a means unacceptable under the First Amendment.[9] In barring certain public statements with respect to this issue, the State ban runs directly contrary to the fundamental premises underlying the First Amendment as the guardian of our democracy. That Amendment embodies our trust in the free exchange of ideas as the means by which the people are to choose between good ideas and bad, and between candidates for political office. The State's fear that voters might make an ill-advised choice does not provide the State with a compelling justification for limiting speech. It is simply not the function of government to "select which issues are worth discussing or debating," *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972), in the course of a political campaign.

## C

*Amicus* points out that § 121.055, as applied through *Sparks* v. *Boggs*, *supra*, bars promises to serve at a reduced salary only when the salary of the official has been "fixed by law," and where the promise cannot, therefore, be delivered. Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements. *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974). But "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive,'" *New York Times Co.* v. *Sullivan*, 376 U. S. 254,

---

[9] A State could address this concern by prohibiting the reduction of a public official's salary during his term of office, as Kentucky has done here. See n. 5, *supra*. Such a prohibition does not offend the First Amendment. We note, only in passing, that along with the 10 proposed Articles that upon ratification became the first 10 Amendments to the Constitution, were 2 others, proposed Articles I and II, which were not ratified. Article II provided: "No law varying the compensation for the services of the Senators and Representatives shall take effect, until an election of Representatives shall have intervened."

271–272 (1964), quoting *NAACP* v. *Button*, 371 U. S. 415, 433 (1963). Section 121.055, as applied in this case, has not afforded the requisite "breathing space."

The Commonwealth of Kentucky has provided that a candidate for public office forfeits his electoral victory if he errs in announcing that he will, if elected, serve at a reduced salary. As the Kentucky courts have made clear in this case, a candidate's liability under § 121.055 for such an error is absolute: His election victory must be voided even if the offending statement was made in good faith and was quickly repudiated. The chilling effect of such absolute accountability for factual misstatements in the course of political debate is incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns. See *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265 (1971); *Ocala Star-Banner Co.* v. *Damron*, 401 U. S. 295 (1971). Although the state interest in protecting the political process from distortions caused by untrue and inaccurate speech is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount. Whenever compatible with the underlying interests at stake, under the regime of that Amendment "we depend for . . . correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz* v. *Robert Welch, Inc.*, *supra*, at 339–340. In a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent. The preferred First Amendment remedy of "more speech, not enforced silence," *Whitney* v. *California*, 274 U. S. 357, 377 (1927) (Brandeis, J., concurring), thus has special force. Cf. *Gertz* v. *Robert Welch, Inc.*, *supra*, at 344. There has been no showing in this case that petitioner made the disputed statement other than in good faith and without knowledge of its falsity, or that he made the statement with reckless disregard as to whether it was false or not. Moreover, petitioner re-

tracted the statement promptly after discovering that it might have been false. Under these circumstances, nullifying petitioner's election victory was inconsistent with the atmosphere of robust political debate protected by the First Amendment.

## IV

Because we conclude that § 121.055 has been applied in this case to limit speech in violation of the First Amendment, we reverse the judgment of the Kentucky Court of Appeals and remand for proceedings not inconsistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE concurs in the judgment.

JUSTICE REHNQUIST, concurring in the result.

I agree that the provision of the Kentucky Corrupt Practices Act discussed by the Court in its opinion impermissibly limits freedom of speech on the part of political candidates in violation of the First and Fourteenth Amendments to the United States Constitution. Because on different facts I think I would give more weight to the State's interest in preventing corruption in elections, I am unable to join the Court's analogy between such laws and state defamation laws. I think *Mills* v. *Alabama*, 384 U. S. 214 (1966), affords ample basis for reaching the result at which the Court arrives, and I see no need to rely on other precedents which do not involve state efforts to regulate the electoral process.