**Bernice J. DOLAN, Former President of the Transport Workers Union, Local 553, Plaintiff-Appellee,**

v.

**TRANSPORT WORKERS UNION OF AMERICA, et al., Defendants-Appellants.**

No. 82–5153.

United States Court of Appeals, Eleventh Circuit.

Nov. 12, 1984.

Opinion on Denial of Rehearing Jan. 28, 1985.

---

Alan E. Greenfield, Dubbin, Schiff, Berkman & Dubbin, Evan Langbein, Miami, Fla., O'Donnell & Schwartz, Asher W. Schwartz, New York City, for defendants-appellants.

Carmen L. Leon, Miami, Fla., for Eastern Airlines.

Elizabeth J. Du Fresne, Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

GOLDBERG, Senior Circuit Judge:

Five members of the governing board of a union local, the local itself, and the union's international organization appeal a general jury verdict against them in the amount of $93,000. The plaintiff, Bernice Dolan, a former president of the union local, based her claims below on various sections of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). Appellants claim that one of the grounds of recovery submitted to the jury was not consistent with either the letter or spirit of the LMRDA section relied upon by Dolan. Our review of the case confirms this inconsistency, and we therefore reverse.

## BACKGROUND

Appellee, Ms. Dolan, was elected President of Local 553 of the Transport Workers Union of America, AFL–CIO (the "Local") on February 1, 1975. In the twenty-five years prior to the 1975 election, Dolan had worked as a flight attendant for Eastern Airlines and had actively participated in union affairs. Upon her election, she took a leave from work as a flight attendant; the President's office constitutes the only full-time, salaried position within the Local.

The Local is part of the Transport Workers Union of America, AFL–CIO (the "International"). Both the Local and the International are subject to the rules and regulations of the International Constitution. *See* Plaintiff's Exhibit 5. Article XII, Section 2 of the Constitution provides that between meetings of the Local's general membership, a Local Executive Board "shall have the power and authority to administer the affairs" of the Local. Local 553's Executive Board consists of thirteen elected members, including the President, four other officers, and eight members elected from various cities that Eastern services. Article XXI of the International Constitution provides that the Executive Board may suspend any officer who "fails

or refuses to adhere to, or carry out the instructions, directions or decisions of the Local Executive Board or of the Local Union or of the International Executive Council."

During Dolan's tenure, differences developed between her and a number of the members of the Executive Board. On April 13, 1976, little more than a year after her election, a majority of the members of the Executive Board voted to suspend Dolan from her post as President. In a letter dated April 16, 1976, acting Board President John Jacobus, a named defendant in the case, provided Dolan with a statement of the reasons for her suspension. The list of reasons mentioned, *inter alia,* Dolan's refusal to call a meeting of the Executive Board when properly requested by the requisite number of Board members, her failure to execute a number of specific directives of the Executive Board, and various improper uses and misappropriations of union funds. *See* Plaintiff's Exhibit 1. Six days later, the Board amended the "notification of charges," asserting an additional misappropriation of funds and a failure by Dolan to pay her monthly union dues. Dolan responded to the original charges via a letter on April 22, and answered the two additional charges in a letter dated April 29.

Commencing on April 29, the Board conducted a hearing to decide whether Dolan should be removed from office.[1] The hearing lasted three days during which Dolan was allowed to appear and testify, to cross examine witnesses called by the Board, and to call any union member as a witness. Members of the Executive Board served as a hearing panel, and on May 5, 1976, she

was removed as President. A letter to Dolan explained the decision to remove her, listing the various charges of which she had been found guilty. The findings of guilt included the charges of misappropriation of funds and failure to pay monthly dues. The Board removed her for the balance of her elected term and prohibited her from holding any elected office before February 1, 1978.

Dolan appealed the Executive Board's action to the International Committee on Appeals pursuant to Article XXIII of the Constitution. The Committee unanimously denied her appeal on August 5, 1976. The denial cited Dolan's misappropriation of money and her failure to pay dues, stating that these two grounds for removal made it unnecessary to review the other findings of the Executive Board. The Committee amended the Board's action as to Dolan's ineligibility to hold office, though, holding her ineligible to occupy any appointive or elective position in the union until restoration of eligibility by the International Executive Council.[2] Dolan then appealed to the International Convention, which denied her appeal. There is no evidence, however, that by the time of trial Dolan had made any attempt to have the International Executive Council restore her eligibility for office.

### PROCEDURE BELOW

Dolan filed a complaint in federal district court, seeking a temporary restraining order and mandatory injunction against the International and the Local, as well as against individual members of the Executive Board.[3] She asked that her name be

---

1. The hearing was held pursuant to Article XXI of the International Constitution.

2. The Committee cited Section 12 of Article XIII of the Constitution:

 Any member who has been found guilty, after charges and trial, and any member who has been removed from office, pursuant to the procedures of this Constitution or of his Local's by-laws, shall be ineligible to be a candidate in any election, or to hold any appointive position, in his Local Union or in the Interna-

 tional Union, unless and until the International Executive Council shall have restored his eligibility.

3. The complaint named the following persons as individual defendants: John Jacobus, Vicki Landry Triolo, Vicky Griffith, Kathy Bailey, Mary Don Erskine, Stephen Nower, Candace Minot, Anna Flagg, William Redford, and William Lindner. Except for Redford and Lindner who were associated with the International, all individual defendants were members of the Executive Board.

placed on the ballot for a special election. In addition, she named Eastern as a defendant and sought damages from all defendants. She invoked the court's jurisdiction pursuant to Title 1, Section 102 of LMRDA, as amended, 29 U.S.C. § 412. She based her federal claims on Sections 101 and 609 of LMRDA, as amended, 29 U.S.C. §§ 411 and 529. The complaint also contained a claim of civil conspiracy and pendent claims of slander and breach of contract.

The LMRDA claims fell under the Act's "equal rights" provision, 29 U.S.C. § 411(a)(1),[4] its "free speech" provision, 29 U.S.C. § 411(a)(2),[5] and its "due process" provision, 29 U.S.C. § 411(a)(5).[6] The main theme of Dolan's factual allegations, both in her complaint and at trial, was that she was removed from office and rendered ineligible for reelection as discipline for expressing her views on certain subjects of union business. The speech for which she was allegedly disciplined involved three specific issues.

The first issue concerned a wage freeze proposed by the management of Eastern. Dolan asserts that because of her support of the freeze, "strong personal animosity"

developed between her and the International—specifically, between her and William Lindner and William Redford, Vice Presidents of the International.

The second "speech" issue involved Dolan's efforts on behalf of a male flight attendant, Steven Crain, who was allegedly struck by an Eastern captain. Dolan ordered an investigation of the matter and requested that internal action against the captain be taken by Frank Borman, President of Eastern. Several hostile conversations ensued between Dolan and Borman. When Crain eventually filed criminal charges against the captain, Dolan provided information that enabled police to arrest the captain. She drove from Miami to Daytona to witness the arrest. The Executive Board, while it initially supported Dolan's decision to personally and aggressively assist Crain, ultimately found itself in disagreement with Dolan's handling of the issue. Certain members suggested that she was pushing things too far and expressed fear that she might be opening the door to a lawsuit against the union.

The third issue involved differences between Dolan and the International and the Executive Board regarding who would be

---

**4.** § 411(a)(1):

Equal Rights—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

**5.** § 411(a)(2)

Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refrain-

ing from conduct that would interfere with its performance of its legal or contractual obligations.

**6.** § 411(a)(5)

Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayments of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

She also asserted 29 U.S.C. § 529 as a basis for relief.

§ 529—Prohibition on certain discipline by labor organization.

It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.

appointed as members of a team that was to negotiate new contracts with Eastern. The International and the Executive Board wanted some members of the Board placed on the team. Dolan, asserting that she had exclusive authority to appoint the team, refused to include on it members of the Executive Board.

In addition to her free speech claim, Dolan charged that the hearing panel members were predisposed to find her guilty, and therefore the hearing procedures violated LMRDA's due process provision, § 411(a)(5). Finally, in the civil conspiracy count, she alleged that certain officials of the International, members of the Executive Board, and certain Eastern Airlines officials maliciously conspired to deprive her of her office.[7]

Following a hearing, the district court denied Dolan's application for a temporary restraining order and preliminary mandatory injunction. The court found that her claim for equitable relief was barred by laches and that she had little probability of success on the merits. Dolan then dropped her claim for equitable relief and tried her case for damages before a jury. During the ten day trial, the International, the Local, and various individual defendants moved for directed verdicts four times: after Dolan's opening statement, in the midst of Dolan's testimony on direct, at the close of her case, and at the close of all evidence. The court directed a verdict in favor of Eastern and in favor of the one individual defendant, Lindner, named in the slander claim. The court submitted plaintiff's LMRDA claims and the related civil conspiracy claim to the jury. The jury re-turned a verdict in favor of four of the individual defendants,[8] but found against the International, the Local, Redford, Jacobus, Triolo, Bailey, and Flagg. Dolan was awarded $35,000 in compensatory damages. The jury also awarded punitive damages in the following amounts: $25,000 against the International; $25,000 against the Local; $3,000 against Jacobus, Bailey and Flagg; and $1,000 against Triolo and Redford. The losing defendants then filed post-trial motions in the alternative for judgment notwithstanding the verdict, for a new trial, to alter or amend judgment, or to set a remittitur. The district court denied the motions; this appeal follows.

## ISSUES ON APPEAL

Appellants press two major arguments in opposition to the finding of liability reached below. The first concerns Dolan's allegations under LMRDA's free speech provision, § 411(a)(2), and due process provision, § 411(a)(5). The argument focuses on Dolan's admitted nonpayment of union dues for a period of fourteen months during her Presidency. Citing provisions of the International Constitution dealing with dues requirements and eligibility to run for or hold elected union office,[9] appellants argue that the Constitution required both the removal of Dolan from office and the imposition of restrictions upon her future eligibility to run. In short, it was enforcement of the Constitution rather than any attempt to punish Dolan's speech that led to the actions taken against her. Appellants emphasize the proviso in § 411(a)(2) allowing

---

7. The slander and breach of contract claims played little part in Dolan's action. The district court granted summary judgment in favor of appellants on the breach of contract claim. The court directed a verdict for the defendant on the slander claim. Neither claim is before us on appeal.

8. Lindner, Griffith, Erskine, and Minot.

9. Article XIII, § 3 provides in pertinent part: Any member who fails to pay his dues for a particular month on or before the 15th day of such month shall be in bad standing.

Article XIII, § 4 provides in pertinent part: Any member in bad standing shall be ineligible to attend union meetings, to be a candidate for or hold any union office or position, or to vote in any union election or referendum, or otherwise participate in union affairs.

Article XV, § 3 provides in pertinent part: No member shall be eligible for nomination or election to any office unless he shall have been in continuous good standing in his local union for the period of twelve (12) months immediately preceding nomination.

the union to adopt "reasonable rules"[10] and note the trial court's instruction to the jury that the union's rules. and regulations were binding and proper. Appellants also point out that the protections provided in § 411(a)(5) do not apply to a member disciplined for nonpayment of dues.[11] Dolan responds that she presented evidence at trial that the Local had an ongoing policy of notifying any member who was delinquent in the dues payments before taking any action against that member. The Local allegedly ignored that policy with regard to Dolan as a part of the conspiracy to punish her for her exercise of protected speech.

Appellants' second argument for reversal centers on their contention that the "speech" for which Dolan was allegedly punished involved her duties as union President. Contending that § 411(a)(2) applies only to pure "membership speech" and not to speech or conduct relating to the duties of a union officer, appellants urge that the trial court submitted an improper ground for recovery to the jury.

We find merit in appellants' second argument and hold that the judgment against appellants must be reversed. Thus, we need not and do not reach appellants' argument concerning nonpayment of dues, nor do we reach additional claims by appellants that the damages awarded by the jury were improper.

## DISCUSSION

### A. The Dual Spirit of LMRDA

In the late 1950's, congressional concern surfaced about abusive, oppressive tactics employed by the leadership of some labor unions. This concern sparked passage of LMRDA. In implementing the Act, Congress focused its efforts in two areas. Title IV of LMRDA reaches union election procedures, campaign financing, distribution of campaign literature, inspection of membership lists, use of union dues, eligibility of candidates for office, and removal of officers for misconduct.[12] Title IV, therefore, affects a union's relationship with its membership as a whole. Title I, by contrast, registers Congress's concern with the rights of individual union members. *Finnegan v. Leu,* 456 U.S. 431, 437, 102 S.Ct. 1867, 1871, 72 L.Ed.2d 239 (1982).[13]

Congress structured two different systems of enforcement for these two parts of LMRDA. Title IV provides for a system of administrative and judicial procedures, imparting to the Secretary of Labor a substantial role in enforcement. *See* 29 U.S.C. § 464. Title I allows an aggrieved union member to take her complaint directly to federal court. *See* 29 U.S.C. § 412.

Underlying both titles to the Act, however, exists a broad notion that unions should be democratized. *See Wirtz v. Local 153, Glass Bottle Blowers Ass'n.,* 389 U.S. 463, 470–71, 88 S.Ct. 643, 647–48, 19 L.Ed.2d 705 (1968). Given the longstanding place of democratic ideals in this country's political and legal history, the sources of this generalized desire to see democratic principles at work in labor unions are not hard to understand. Democratic ideals alone, though, do not account for the form that LMRDA eventually took. Exerting a countervailing force to Congress's desire to legislate union democracy was a more modern, but still well established, policy against government interference with the internal affairs of unions. The Senate Re-

10. See supra, note 5.

11. See supra, note 6.

12. See 29 U.S.C. § 481.

13. Our emphasis on congressional intent reflects a concern articulated in *Wirtz v. Local ·153, Glass Bottle Blowers Ass'n., supra,* 389 U.S. at 468, 88 S.Ct. at 646 (1968):
 We have cautioned against a literal reading of congressional labor legislation; such legis-

lation is often the product of conflict and compromise between strongly held and opposed views, and its proper construction frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve. The LMRDA is no exception.
(Footnote and citation omitted).

port accompanying the Act reflects this policy.

A strong independent labor movement is a vital part of American institutions. The shocking abuses revealed by recent investigations have been confined to a few unions. The overwhelming majority are honestly and democratically run. In providing remedies for existing evils, the Senate should be careful neither to undermine self-government within the labor movement nor to weaken unions in their role as the bargaining representatives of employees.

S.Rep. No. 187, 86th Cong., 1st Sess., 5 (1959); U.S.Code Cong. and Admin.News, pp. 2318, 2322; *see also Hodgson v. Local Union 6799, United Steelworkers of America,* 403 U.S. 333, 338–39, 91 S.Ct. 1841, 1845, 29 L.Ed.2d 510 (1971); *Wirtz v. Local 153, Glass Bottle Blowers Ass'n., supra,* 389 U.S. at 470–71, 88 S.Ct. at 647–48 (1968). This latter force surfaced in Congress's choice to act via a set of particularized rules, regulating discrete areas of union management. Congress did not provide for comprehensive administrative review of union-management policies, nor did it invite the courts to "intervene at will" in unions' internal affairs. *See Smith v. Local No. 25, Sheet Metal Workers,* 500 F.2d 741, 750 (5th Cir.1974); *Airline Maintenance Lodge 702 v. Loudermilk,* 444 F.2d 719, 723 (5th Cir.1971). Even with the enactment of Title IV, which provides a relatively extensive set of controls, Congress left unions generally free to run their own elections. *See Steelworkers v. Sadlowski,* 457 U.S. 102, 117, 102 S.Ct. 2339, 2348, 72 L.Ed.2d 707 (1982); *see also Denov v. Chicago Fed'n of Musicians, Local 10–208,* 703 F.2d 1034, 1040 (7th Cir.1983).

■ This dual spirit of LMRDA—the desire to democratize unions while resisting extensive and unnecessary invasion of their independence—also surfaces in Title I. The "Bill of Rights of Members of Labor Organizations" confers specific rights that are more limited than their shorthand names—"free speech" and "due process"—might suggest. The procedural protections that must be accorded under § 411(a)(5)

before a union member may be disciplined flow from the specifics of the provisions, *see International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 243–248, 91 S.Ct. 609, 615–18, 28 L.Ed.2d 609 (1971), and not from the panoply of protections that the federal Constitution gives criminal defendants. *Curtis v. International Alliance of Theatrical Stage Employees,* 687 F.2d 1024, 1027 (7th Cir.1982); *Ritz v. O'Donnell,* 566 F.2d 731, 735 (D.C.Cir.1977). According to its terms, § 411(a)(5) does not extend to discipline for nonpayment of dues; nor does it guarantee any protections as far as removal of a union member from his post as an officer or employee of the union. *Finnegan,* 102 S.Ct. at 1871–72.

Likewise, LMRDA's free speech provision is not congruent with its nominal Constitutional counterpart. The Supreme Court recently declared that

> there is absolutely no indication that Congress intended the scope of § 101(a)(2) to be identical to the scope of the First Amendment. Rather, Congress' decision to include a proviso covering "reasonable" rules refutes that proposition. First Amendment freedoms may not be infringed absent a compelling governmental interest. Even then, any government regulation must be carefully tailored, so that rights are not needlessly impaired. *Brown v. Hartlage,* 456 U.S. 45, 53–54, 102 S.Ct. 1523 [, 1529], 71 L.Ed.2d 732 (1982). Union rules, by contrast, are valid under § 101(a)(2) so long as they are reasonable; they need not pass the stringent tests applied in the First Amendment context.

*Steelworkers v. Sadlowski, supra,* 457 U.S. at 111, 102 S.Ct. at 2345. In sum, despite Congress's broad goal to democratize unions in passing LMRDA, the Act confers specific, delimitable rights. Moreover, claims arising under LMRDA, including claims under § 411(a)(2), derive a more limited scope from the congressional policy of noninterference with unions' internal affairs.

## B. Section 411(a)(2) and the Rights of Union Officers

Appellants claim that this policy of non-interference should be the critical consideration in the instant case. Urging that all three of the grounds for which Dolan alleges she was punished were connected with her duties as Local President, appellants argue that permitting § 411(a)(2) liability would significantly interfere with the management of the union. They cite *Finnegan, supra*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239, for the proposition that such interference is not warranted under the Act.

In *Finnegan*, a newly elected union president discharged a number of union officials appointed by the previous president. The Supreme Court held, *inter alia*, that the discharges did not give rise to an action under § 411(a)(2). The Court stressed that under Title I, "it was rank and file union members—not union officers or employees, as such—whom Congress sought to protect." *Id.* 102 S.Ct. at 1871 and 1873. The Act was not intended to address the issue of union patronage. In a footnote, the Court stated:

> We think it virtually inconceivable that Congress would have prohibited the long-standing practice of union patronage without any discussion in the legislative history of the Act. Had such a result been contemplated, it undoubtedly would have encountered substantial resistance. Moreover, Congress likely would have made some express accommodation to the needs of union employers to appoint and remove policymaking officials.

(citations omitted). *Id.* 102 S.Ct. at 1873. The union bylaws relevant in *Finnegan* gave the President authority to discharge the officials in question. Nothing in the Act persuaded the Court that Congress intended to change the "traditional pattern" of union management challenged by the plaintiffs. *Id.*

The Court's reasoning in *Finnegan* is, to a large degree, relevant to this case. Specifically, the *Finnegan* Court demonstrated a reluctance to allow § 411(a)(2) to be used to interfere with a union's intra-management policy or personnel decisions. Allegations that union officials were forced to choose between the right to free expression and their jobs did not overcome the union's interest in maintaining the patronage system and its interest in interpreting and enforcing personnel rules in the union by-laws. Furthermore, the Court heavily emphasized Title I's protection of members' rights as opposed to officers' rights.

This case differs from *Finnegan*, of course, in that it involves actions against an elected official by a group of elected officials. The patronage system of appointments and removals is not involved. Dolan argues that this fact makes the reasoning of *Finnegan* irrelevant to her case. Admittedly, in *Finnegan*, the Supreme Court emphasized the consistency with democratic governance of the patronage system. Ouster of an elected official undeniably poses a greater potential threat to LMRDA's broad goal of democratizing unions than do patronage dismissals. Dolan's argument that her conduct was protected by § 411(a)(2), however, ignores the time-tested construction of the provision as one that confers specific rights. Despite the greater potential threat to democratic governance of removing an elected union official, the increased danger does not, in itself, transform allegations of ouster from office into a § 411(a)(2) claim for infringement of membership speech. Courts in other circuits have reached this same conclusion, both pre-*Finnegan*, see *Newman v. Local 1101, Communications Workers of America*, 570 F.2d 439, 449 (2d Cir.1978), and post-*Finnegan*, see *Adams-Lundy v. Association of Professional Flight Attendants*, 731 F.2d 1154 (5th Cir.1984). Neither § 411(a)(2) nor LMRDA as a whole were intended to eliminate all threats to union democracy.

However, the fact that this case involves a conflict among elected officials rather than the operation of a patronage system does suggest a different approach to Dolan's § 411(a)(2) claim than the one taken in *Finnegan*. In the latter case, the Supreme

Court refused even to consider plaintiffs' claims that their membership speech rights had been infringed [14] because it found the practice of patronage appointments and dismissals inherently reasonable and consistent with democratic practices. Although the Board's actions against Dolan were arguably consistent with the powers given it under the union Constitution,[15] there is nothing inherently reasonable or unreasonable about an elected board's ouster of one of its members. Thus, we cannot say that *Finnegan's* broad stamp of approval for patronage appointments and dismissals [16] should be extended to power struggles within the elected ranks of union management.

 The conflict in this case is resolvable at a more basic level than the conflict in *Finnegan;* the critical issue here is whether the speech for which Dolan alleges she was punished constituted only membership speech or comprised something more. All speech by a member is, in a sense, membership speech. But when a member assumes a union office, the office can imbue the member's speech with additional significance. Depending on the content of the speech and the nature of the office, the officer's speech may either advance her duties of office or interfere with these duties. If the speech does either, it is no longer membership speech but has been transformed into "officer speech". In addition, officers with broad policymaking or policy enforcing powers may be considered to be "speaking for the union" on most any issue relevant to union policy. If the court determines that an officer could reasonably be perceived as speaking for the union, or if her speech affects performance of her specific duties, the protections of § 411(a)(2) for membership speech do not apply.[17]

We cut this considerable swath through the coverage of § 411(a)(2), because we believe it to be the most meaningful and workable way to differentiate the rights of an officer from those of a member. Faithfulness to congressional intent requires that we make this differentiation. LMRDA's legislative history, the words of the statute, and prior case precedent simply do not reveal protection under § 411(a)(2) for union officers when they speak as officers. Claims by an officer, based on alleged interference with free speech rights, will, if allowed, invariably require the court to interfere in the relationships among those running unions. When a claim asserted under Title I would require federal court intervention in decisions made by management about management, courts must measure their steps with extreme care.

 In this case, the speech for which Dolan alleges she was punished was inextricably entangled with her duties as an officer. As President, Dolan occupied a role in union management as both policymaker and policy enforcer. The wage-freeze controversy and the appointment of

---

**14.** In *Finnegan,* the plaintiffs alleged that they were forced to choose between the right to free expression—i.e., the right to support the previous President—and their jobs. 102 S.Ct. at 1873.

**15.** Article XXI of the Union Constitution provides in pertinent part:

Any officer of a Local Union, or of a branch, section, or division thereof, who fails or refuses to adhere to, or carry out, the instructions, directions, or decisions of the Local Executive Board or of the Local Union or of the International Executive Council, or who acts in violation of the Constitution, may be suspended forthwith by the Local Executive Board, or by the International Executive Council.

**16.** The Court left open the question "whether a different result might obtain in a case involving nonpolicymaking and nonconfidential employee." *Id.* 102 S.Ct. at 1873, n. 11.

**17.** We mean only to address individual officers' claims concerning their own membership speech rights. Allegations that discharge of an officer was "part of a purposeful and deliberate attempt to suppress dissent within the union" would raise other questions. *See Finnegan, supra,* 102 S.Ct. at 1873 *quoting Schonfeld v. Penza,* 477 F.2d 899, 904 (2d Cir.1973). Because Dolan makes no such allegations, we leave resolution of those questions to another day.

members to the negotiating team involved issues of basic union policy, the kind for which the union's Executive Board and President had extensive responsibility. Dolan's public assumption of a position contrary to that of the Board and International, in itself, affected performance of her duties.[18] The Crain incident and subsequent complaint became such an important issue to the union membership that both the Executive Board and the International took positions. Dolan's stand on the Crain issue and her efforts on behalf of Mr. Crain cannot be separated from her duties as President and as a Board member. We can only conclude that the Board's alleged punishment of Dolan for speech relating to those issues cannot support a claim under § 411(a)(2).

■ Although Dolan cannot premise an LMRDA free speech claim on the Board's action insofar as it related to her activity as an officer, we must nevertheless examine the scope of the punishment. To the extent the Board's action interfered with Dolan's speech as a member, § 411(a)(2) is relevant regardless of the ostensible rationale for that punishment. The Board's action against Dolan consisted of both ousting her from office and restricting her right to reelection. With regard to the first sanction, her removal from office did not, in itself, deprive her of any member speech right. Dolan's position as President enabled her to speak as an officer; it had no bearing on her ability to speak as a member.

Prohibiting Dolan from seeking reelection for a period of time, however, directly affected her ability to speak as a member. Under the International Constitution, each union member in good standing has the right to be nominated and to run for union office.[19] More importantly, a member's speech takes on added meaning and significance in the context of a legitimate campaign for elective office. *Cf. Sadlowski, supra,* 457 U.S. at 115, 102 S.Ct. at 2347 (union's rule prohibiting nonmember contributions to campaigns for union office may implicate rights under § 411(a)(2)). Indeed, by the express terms of § 411(a)(2), Dolan would state a claim if this direct infringement of her speech rights did not accord with "reasonable" union rules. *See id.* at 112–21, 102 S.Ct. at 2346–50.

■ Of course, some restrictions on the free speech rights of members are permissible. For example, a union may, consistent with the LMRDA, disallow financial contributions to union campaigns from sources external to the union. *Id.* However, where a deprivation seeks to respond only to an individual's actions taken in an officer's capacity, the union's suppression of speech must correspond in some practical way with the harm sought to be assuaged. Union leadership cannot by dint of authority prevent a dissenting member from attempting to regain office. At least under the circumstances of this case, such action constitutes an unreasonable regulation of member speech.

■ Moreover, while the union asserted seemingly neutral, rules-based grounds for the rescission of Dolan's membership rights—namely, her lapse in dues payments and misappropriation of funds—motive is not irrelevant to analyzing the deprivation of a member's free speech rights. If the finder of fact concludes that the primary reason behind the denial of Dolan's right to seek reelection was disagreement with her views as President, the existence of a reasonable rule concerning dues cannot cleanse its unreasonable application. A union cannot seize upon the coincidence of officership with membership as

---

**18.** We can imagine a situation where an officer's opposition to management policy (even regarding a policy for which the officer had responsibility to implement) might be so limited or qualified as not to affect performance of the officer's duties. Such a situation clearly did not exist in this case. Dolan, in fact, asserts that her supporters "felt that her fighting words"

[regarding the three controverted issues] were just exactly what they wanted the President of Local 553 to be saying *to carry out her leadership role.* (Emphasis added.) Appellee's Brief, p. 34.

**19.** Article XV.

a pretext for retaliating against the exercise of member speech.

Despite the substantial concern for the free speech rights of members, we must reverse the jury verdict against appellants. The jury instructions intimated that § 411(a)(2) liability would exist merely upon a finding that appellants had removed Dolan from office in retaliation for speech relating to the wage freeze, the Crain controversy, and appointments to the negotiating team.[20] The application of otherwise reasonable union rules, however, can constitute a § 411(a)(2) violation only when exercised in a retaliatory manner with regard to member, not officer, speech. Thus, although the judge instructed that the union's rules were controlling and proper,[21] he submitted a theory of recovery that assumed the unreasonableness of punishing any type of speech. The basic error below was the failure to distinguish officer speech from member speech.[22] In the absence of a finding that the union was interfering with Dolan's member speech, there can be no liability under § 411(a)(2). *See id.*

We find that the district court allowed the jury to assess damages based on an improper theory of § 411(a)(2) liability. Because the jury's verdict was a general one,[23] we reverse the judgment in its entirety and remand for proceedings to determine whether appellee suffered damages

as a result of the unreasonable deprivation of her free speech rights as a union member.

REVERSED and REMANDED.

**ON PETITION FOR REHEARING**

PER CURIAM:

Appellees contend on petition for rehearing of our prior decision (11th Cir.1984), that appellants failed to preserve error on the issue of officer versus member speech. We direct petitioners' attention to volume 8 of the Record on Appeal at 9, 70–73.

The petition for rehearing is DENIED.

---

**20.** The judge instructed that, "You don't retaliate for exercising free speech. That is the issue in this case." Transcript, Vol. 8, p. 46. He framed the issue to the jury as follows:

[T]he plaintiff says ..., "I was improperly treated under Count Two because they disciplined me, the union and the International, not because of what their defenses are, but because I asserted my right of free speech in ways that have been argued to you."

That is her claim, because she asserted her right of free speech, which is guaranteed under the Landrum-Griffin Act. "They have disciplined me and not for the reasons they say." *Id.* at 48.

**21.** Transcript, Vol. 8, p. 42.

**22.** Appellants specifically objected to the judge's charge that the alleged retaliation for officer speech formed the basis for § 411(a)(2) liability. *See* Transcript, Vol. 8, p. 53. We find that while

appellants' objections to the charge and their proposed instructions did not articulate a proper theory of § 411(a)(2) liability, their objection to the charge of unconditional liability based on punishment of "speech" preserves the § 411(a)(2) liability issue for appeal.

**23.** Because the jury awarded punitive damages, which the court's instructions made clear were available only under the civil conspiracy count, we assume that the jury found liability under this count. Liability under the conspiracy count could also have rested upon allegations of retaliation for officer speech. The judge's instructions contained the following:

In this case the plaintiff is saying that what happened, what I have already told you about, is retaliation for her exercise of free speech. She says that these defendants conspired against her to have that happen, to accomplish that.

Transcript, Vol. 8, p. 53.