# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALAN PORTER; PATRICK KERR;
STEVEN LEWIS; WILLIAM J. CODY,
       *Plaintiffs-Appellants,*

       v.

DEBRA BOWEN,* in her official
capacity as California Secretary of
State; BILL JONES, in his individual
capacity,

       *Defendants-Appellees.*

No. 06-55517

D.C. No.
CV-00-11700-RJK

OPINION

Appeal from the United States District Court
for the Central District of California
Robert J. Kelleher, Senior Judge, Presiding

Argued and Submitted
May 18, 2007—Pasadena, California

Filed August 6, 2007

Before: Raymond C. Fisher and Richard R. Clifton,
Circuit Judges, and Ricardo Martinez, District Judge.**

Opinion by Judge Fisher

*Debra Bowen is substituted for her predecessor, Bruce McPherson, as Secretary of State, pursuant to Fed. R. App. P. 43(c)(2).

**The Honorable Ricardo S. Martinez, United States District Judge for the Western District of Washington, sitting by designation.

**COUNSEL**

Peter J. Eliasberg (argued) and Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, California, and Lisa J. Danetz and Brenda Wright, National Voting Rights Institute, Boston, Massachusetts, for the appellants.

Bill Lockyer, Attorney General, Stacy Boulware Eurie, Senior Assistant Attorney General, Catherine M. Van Aken, Supervising Deputy Attorney General, Diana L. Cuomo, Deputy Attorney General, and Zackery P. Morazzini, Deputy Attorney General (argued), Sacramento, California, for the appellees.

**OPINION**

FISHER, Circuit Judge:

The 2000 presidential election was one of the closest in our nation's history. Polls in the weeks before election day showed a statistical dead heat, *see* Election 2000, http://www.pollingreport.com/2000.htm#TRIAL, and George W. Bush eventually prevailed even though Al Gore received a plurality of the national popular vote. The 2000 election also featured third-party candidates on both the left and right ends of the political spectrum: respectively, Green Party nominee Ralph Nader and Reform Party nominee Pat Buchanan. Although Nader and Buchanan ultimately combined to receive only 3.1 percent of the national popular vote, their importance was magnified by the closeness of the election. Bush and Gore supporters worried that so-called "swing

states" might be tipped one way or another by votes for third-party candidates. *See, e.g.*, James Dao, *Democrats Hear Thunder on Left, and Try To Steal Some of Nader's*, N.Y. Times, Oct. 25, 2000, at A1. The public's attention also became particularly focused on the peculiarities of the American electoral system, under which small numbers of third-party votes can prove decisive in closely contested states because of their winner-take-all rules for the allocation of presidential electors, and a candidate can win the presidency despite losing the national popular vote. *See, e.g.*, Michael Kranish, *Electoral College Count Looming Larger This Year*, Boston Globe, Oct. 26, 2000, at A30. Winner-take-all systems allocate all of a state's electoral votes to the candidate who receives the most popular votes in that state, even if his share of the vote is less than an outright majority. Almost all states employ this system; only two, Maine and Nebraska, allocate electoral votes on a district-by-district basis.

It was in this highly charged political atmosphere that Appellants created two websites, voteswap2000.com and votexchange2000.com, that encouraged people to "swap" their votes and provided email-based mechanisms for doing so. The vote-swap mechanisms enabled third-party supporters in a swing state such as Florida or Ohio to agree to be paired with major-party supporters in a "safe state" such as Massachusetts or Texas, whereby the swing-state users would promise to vote for the major-party candidate and, in exchange, the safe-state users would promise to vote for the third-party candidate. The point of the swaps, at least when agreed to by Nader and Gore supporters, was to improve Gore's odds of winning the Democratic-pledged electors in the swing state without reducing Nader's share of the national popular vote (which needed to exceed five percent in order to qualify his party for federal funding in future elections).

Four days after their website began operation, the owners of voteswap2000.com were threatened with criminal prosecution by then-California Secretary of State, Bill Jones, for

alleged violations of various state election and penal code provisions. They immediately disabled the website's vote-swapping mechanism, as did the owners of votex-change2000.com upon learning about that threatened prosecution. Shortly thereafter, Appellants filed this action, alleging that Jones' threatened prosecution violated the First Amendment and the dormant Commerce Clause and exceeded the scope of his authority under California's election code; they sought damages as well as injunctive and declarative relief.

The district court twice found this case to be moot — most recently because of an informal letter from former Secretary of State Kevin Shelley to the California legislature asking for clarification of the state election code provisions. Because the letter does not assure that California will not threaten to prosecute vote-swapping websites in the future, we conclude that this appeal is not moot. On the merits, we hold that Jones violated Appellants' First Amendment rights. The websites' vote-swapping mechanisms as well as the communication and vote swaps they enabled were constitutionally protected. Although California certainly has valid interests in preventing election fraud and corruption, and perhaps in avoiding the subversion of the Electoral College, these interests did not justify the complete disabling of the vote-swapping mechanisms. Because we conclude that Jones' actions were not sufficiently tailored to advance the State's legitimate interests, we do not reach Appellants' further claims that those actions were an unconstitutional prior restraint, violated the dormant Commerce Clause and were ultra vires under state law. Finally, we hold that Jones is entitled to qualified immunity from damages because the constitutionality of halting vote swapping was not clearly established in 2000. The district court's decision is therefore affirmed in part and reversed in part.

## I.  Background

### A.  Factual History

On October 26, 2000, less than two weeks before the upcoming national presidential election, William J. Cody created a website called voteswap2000.com. The website's self-professed goal was "[t]o maximize the percentage of the popular vote that Nader receives, yet allow Gore to win the national election." To this end, the website contained links to various articles discussing the 2000 election and urging people to swap votes so that Gore would become President and Nader would receive at least five percent of the popular vote. More relevant here, the website also included a matching system that put people who described themselves as "Nader voters in . . . swing states" in e-mail contact with people who described themselves as "Gore voters in blow-out states." Once paired, the individuals could exchange e-mails and agree to trade their votes. As the website put it, "the original Gore voter will vote for Nader, boosting his national popular totals, while the Nader voter will vote for Gore, which will hopefully prevent a Bush victory in that state."

Only swing-state Nader supporters and safe-state Gore supporters were intended to swap votes on voteswap2000.com. States were categorized based on recent polling data, and people who did not identify themselves as swing-state Nader supporters or safe-state Gore supporters could not be paired with other users.[1] However, voteswap2000.com did not seek to verify any person's state (or even country) of residence, nor could the website prevent people from being dishonest about

---

[1]Users who identified themselves as being from states that were only *leaning* toward Bush or Gore (Georgia, Kentucky, Louisiana, North Carolina and Ohio for Bush; California, Delaware, Illinois and New Jersey for Gore) could not swap votes on voteswap2000.com, nor could users from states where Nader was not on the ballot (e.g., Oklahoma, North Carolina) or that allocated their electoral votes on a district-by-district basis (Maine and Nebraska).

their voting intentions or swapping votes multiple times by entering multiple e-mail addresses.[2] Because of these limitations, voteswap2000.com suggested that "[i]t is ideal to swap with someone you know and trust," and recommended that anyone who decided to employ its vote-swapping mechanism "[u]se your own good judgement [sic] to determine if the person you are matched with is legitimate, and be aware that some people will try to abuse this system." A separate page within the website, entitled "A Word of Caution," instructed users, "[i]f at any stage of this process something doesn't feel right, we suggest you stop and not continue."

In total, 5,041 people were matched by the voteswap2000.com database. It is unknown, however, how many Nader and Gore votes were actually swapped after users were paired. Given secret balloting, whether either or both of the parties to a vote-swapping agreement followed through on their commitments could not be verified. There was therefore no assurance for users of voteswap2000.com that their counterparts voted in the manner they promised beyond the counterparts' word. As the website told paired individuals, "remember that this is just a friendly agreement, and you are taking their word that they will follow through."

On October 23, 2000, Alan Porter and Anand Ranganathan separately created a website called votexchange2000.com. Like voteswap2000.com, votexchange2000.com explained the dilemma facing third-party supporters in swing states, and advocated a vote-swapping solution whereby "[v]oters in a swing state who wish to vote for a third party candidate could swap their vote with voters in 'safe states' who would normally vote for a leading party candidate." Also as with voteswap2000.com, users of votexchange2000.com were

---

[2]The website did state that "[w]e will do our best to eliminate obviously fake or multiple e-mail addresses," but there is no indication that its owners ever took action to stop such fraud or that they had the technical capacity to do so.

given the e-mail address of an appropriate partner after identifying their own state of residency and voting intentions; at that point, "these two people [could] contact each other and satisfy each other that they [could] trust each other to vote the other's preferences."[3] However, unlike voteswap2000.com, votexchange2000.com was not intended solely to match swing-state Nader supporters with safe-state Gore supporters; instead, *any* third-party supporter in a swing state could be matched with an appropriate major-party supporter in a safe state. Finally, votexchange2000.com included a warning that "[t]here is no way to be absolutely definitely certainly 100% sure" that a vote swap was actually consummated. While "trust[ing] in the innate goodness of people," the website recommended that users "take some reasonable measures to insure that you could trust the other person."

On October 30, 2000, four days after voteswap2000.com began operation (and eight days before the election), the website's owners received a letter from Bill Jones, then Secretary of State of California, informing them that their site was "engaged in criminal activity." The letter continued:

> Your website specifically offers to broker the exchange of votes throughout the United States of America. This activity is corruption of the voting process in violation of Elections Code sections 18521 and 18522 as well as Penal Code section 182, criminal conspiracy. . . . The right to free and fair

---

[3]The provision of e-mail addresses to users of votexchange2000.com was not necessarily instantaneous. Rather, "[a]s soon as [the website's database found] a voter with complementary voting preferences, [it would] send out email to both people telling them about each other." Votexchange2000.com also did not provide as much detail as voteswap2000.com about who was eligible to use its vote-swapping mechanism. It merely stated that "[i]f we think that [people who identified their state of residency and voting intentions] could make a difference by exchanging their vote, we ask for their email address and store it in our database."

elections is a cornerstone of American democracy. Any person or entity that tries to exchange votes or brokers the exchange of votes will be pursued with the utmost vigor . . . . As the Chief Elections Officer of the State of California, I demand that you end this activity immediately. If you continue, you and anyone knowingly working with you may be criminally prosecuted to the fullest extent of the law.

Immediately after receiving Jones's letter, the owners of voteswap2000.com disabled their website's vote-swapping mechanism, barred Internet users outside California from accessing the website, posted a notice on the website about what had happened and e-mailed all people who had been matched about the potential illegality of vote swapping.[4] These actions "satisfactorily resolve[d]" the issue as far as Jones was concerned. Even though they did not receive an analogous letter, the owners of votexchange2000.com also disabled their website's vote-swapping mechanism as soon as they found out about the voteswap2000.com letter. Both websites' owners claim that the threat of prosecution was stressful and frightening; Cody, in particular, alleges that he developed back problems and had to visit a chiropractor shortly after receiving Jones' letter.

Voteswap2000.com was the only website that Jones threatened with prosecution. Votexchange2000.com was never brought to Jones' attention before it ceased operation, though its vote swapping mechanism was very similar to that of voteswap2000.com.[5] No action was taken against websites

_____

[4]The screening of non-Californians may have been done by ascertaining the Internet Protocol ("IP") addresses of visitors to voteswap2000.com, but the record is not clear on this point. *Cf. Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1246 (9th Cir. 2006) (IP addresses provide users' geographical location in most but not all cases).

[5]Because of the similarities between the websites' vote-swapping mechanisms, as well as the fact that the owners of votexchange2000.com dis-

that advocated vote swapping but did not actually include vote-swapping mechanisms. Websites that were the subject of complaints were reviewed by the Secretary of State "on a case-by-case basis, with each review process being very fact intensive."

## B.   Procedural History

Cody, Porter, Patrick Kerr and Steven Lewis ("Appellants") filed the present lawsuit on November 2, 2000 (five days before the presidential election). Kerr is a California citizen who supported Nader but was worried about contributing to a Bush victory in his state; Lewis is a Massachusetts citizen who supported Gore but would have considered swapping his vote with a swing-state Nader supporter. Both Kerr and Lewis were interested in using the vote-swapping mechanisms offered by voteswap2000.com and votexchange2000.com, but were unable to do so after those mechanisms were disabled. Appellants' complaint sought damages as well as declaratory and injunctive relief. Jones was sued for damages in his individual capacity, whereas Debra Bowen, California's current Secretary of State, is a defendant in her official capacity. Given the turnover in the office of the Secretary of State, we refer to Appellees as "Secretary" unless the context requires naming the particular incumbent.

The district court initially denied Appellants' application for a temporary restraining order that would have allowed

---

abled its mechanism as soon as they found out about the threatened prosecution of the owners of voteswap2000.com, we state as shorthand throughout this opinion that Jones threatened *both* websites with prosecution. It seems clear that, had votexchange2000.com been brought to his attention, Jones would have concluded that it too "offer[ed] to broker the exchange of votes throughout the United States." Jones notably does not argue that he would not have threatened to prosecute the owners of votexchange2000.com had he known about their website.

them to continue operation of their websites until the election. The court subsequently dismissed Appellants' damages claim on the ground that they had failed to satisfy the heightened pleading standard for constitutional tort actions, and stayed their claims for prospective relief under the abstention doctrine of *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). We reversed the district court in a published decision. *See Porter v. Jones*, 319 F.3d 483 (9th Cir. 2003) (*Porter I*). We held that this case was not moot, that it was ripe for decision, that the Eleventh Amendment barred neither Appellants' claims for prospective relief nor their damages claims against Jones in his individual capacity and that *Pullman* abstention was inappropriate. *See id.* at 489-93.

Notwithstanding our decision in *Porter I*, the district court on remand granted summary judgment for the Secretary on Appellants' claims for prospective relief on the ground that those claims had become moot. The district court relied on a new letter from then-Secretary of State Kevin Shelley to then-Speaker of the Assembly Herb Wesson. In that letter, Shelley "request[ed] legislative clarification" of the state Election Code provisions that his predecessor, Jones, had invoked against the operators of voteswap2000.com, citing the "general nature of the language of these sections, and the constitutional issues implicated here." "Until such legislative clarifications are made," Shelley added, "I will not seek to prevent the operation of websites such as voteswap2000.com and votexchange2000.com." According to the district court, the Shelley letter "clearly and unequivocally indicated that the laws will not be enforced in the same manner against future conduct by Plaintiffs or others until the legislature provides further clarification." It was therefore "inappropriate" for the court to grant injunctive relief, because there was no "showing that there exists a present, existing and ongoing prohibition against Plaintiffs' activities."

In a separate order, the district court granted summary judgment for Jones on Appellants' damages claims. The court

ruled that Jones was entitled to qualified immunity because "the law regarding the constitutionality of prohibiting internet voteswapping is far from clearly established." The court added that Jones' position that sections 18521 and 18522 of the California Election Code applied to the activities of voteswap2000.com and votexchange2000.com was "objectively reasonable in light of long-established Supreme Court authority and the potential of such trading to corrupt the elections process." The court also noted that the secretaries of state of two other states had reached the same conclusion as Jones about the applicability of vote-buying statutes to websites facilitating vote-swapping.

Judgment was entered in March 2006 and Appellants timely appealed.

## II.   STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo. *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). "Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law." *Id.* Here neither party claims that there is a genuine issue of material fact; we therefore need review only the district court's application of the relevant substantive law.

## III.   DISCUSSION

### A.   Mootness

**[1]** We address at the outset the district court's ruling, based entirely on the Shelley letter, that Appellants' claims for prospective relief are moot. *See Coral Constr. Co. v. King County*, 941 F.2d 910, 927 (9th Cir. 1991) ("Ordinarily, a contention of mootness must be resolved as a threshold matter, since the court would lack jurisdiction to decide a moot

case."). It has long been established that the "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (second alteration in original; internal quotation marks omitted). Only if "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *id.*, and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979), may a case be found moot because the defendant has ceased the complained-of conduct. Moreover, the burden of demonstrating mootness is "heavy" and must be carried by the party claiming that the case is moot. *See Coral Construction*, 941 F.2d at 927-28.

**[2]** We conclude that the Secretary fails to carry the "heavy burden" of establishing that it is "absolutely clear" that California will not threaten to prosecute the owners of voteswap2000.com and votexchange2000.com if they create vote-swapping websites in the future.[6] To begin with, the Shelley letter does not suggest that it is binding on the Secretary of State, nor would a letter addressed to the Speaker of the Assembly typically create legal obligations. Shelley also no longer occupies the position of Secretary of State, and the current incumbent, Secretary Bowen, could initiate the prosecution of vote-swapping websites at her discretion. *Cf. Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir. 1998) ("Defendants have neither asserted nor demonstrated that they will *never* resume [the complained-of conduct] . . . .") (emphasis added). Finally, the Secretary has maintained throughout the nearly seven years of

---

[6]Cody and Porter have stated that they will set up vote-swapping websites analogous to voteswap2000.com and votexchange2000.com if they will not again be threatened with prosecution for doing so. Kerr and Lewis have also expressed their interest in using such websites in the future.

litigation in this case that Jones had the authority under state law to threaten Appellants with prosecution in 2000 — a position in tension with the Shelley letter's statement that the relevant statutory provisions are drafted in general terms and require legislative clarification. *Cf. Bourgeois v. Peters*, 387 F.3d 1303, 1309 (11th Cir. 2004) (case not moot where "[t]he City has argued for over two years that its search policy is constitutional . . . in the face of ongoing litigation").

**[3]** We therefore reverse the district court's ruling that Appellants' claims for prospective relief were mooted by the Shelley letter. Accordingly, we proceed to the merits of Appellants' appeal.[7]

## B.  First Amendment

Appellants principally contend that Jones' threatened criminal prosecution of the owners of voteswap2000.com and votexchange2000.com was not sufficiently tailored to the advancement of the State's legitimate interests and thus unlawfully burdened constitutionally protected speech and conduct. Because we agree with Appellants, we do not reach their further arguments that Jones' actions were an unconstitutional prior restraint and violated the dormant Commerce Clause. We also do not address whether Jones' actions exceeded the scope of his authority under California state election law; even if they did, we would still need to decide

---

[7]For several reasons, we need not remand to the district court to address the merits in the first instance. There are no disputed factual matters at this point; neither party has requested a remand; we are mindful of Appellants' desire for a decision in time for the next presidential election; the district court touched on the merits in its qualified immunity ruling (though not at great length); and, most significantly, we must reach the merits in order to decide whether Jones is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (instructing courts conducting a qualified immunity inquiry first to determine whether a constitutional violation occurred, and only thereafter whether the relevant law was clearly established).

their constitutionality in order to determine whether Jones is entitled to qualified immunity. *See Saucier*, 533 U.S. at 201.

### 1. Protected speech or conduct

[4] The first issue we must resolve is whether Jones' actions burdened any constitutionally protected speech or conduct. That is, did Appellants have a First Amendment interest in voteswap2000.com and votexchange2000's vote-swapping mechanisms or the communication and vote swaps that the mechanisms enabled?[8] Beginning with the vote-swapping mechanisms themselves, we hold that they are entitled to at least some First Amendment protection. The mechanisms conveyed useful information to users by providing them with the e-mail addresses of appropriate counterparts with whom they could swap votes. Voteswap2000.com also offered data about states' political leanings, ballot situations and electoral systems as soon as users of the mechanism identified their states of residency. *See Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) ("communication of information" is "speech interest[ ] . . . within the protection of the First Amendment"); *Giebel v. Sylvester*, 244 F.3d 1182, 1187 (9th Cir. 2001) ("[B]ecause Giebel's handbill was designed to convey information, it constitutes a form of speech protected by the First Amendment.").

[5] As Appellants argue, the vote-swap mechanisms also expressed a reasonably clear message of support for third-

---

[8]Appellants plainly had a First Amendment interest in aspects of their websites *other than* the vote-swapping mechanisms. These other aspects provided information about the 2000 election and expressed Appellants' support for vote swapping, third parties and (in voteswap2000.com's case) Nader and Gore. We limit our inquiry, however, to the vote-swapping mechanisms (and the communication and vote swaps they made possible) because they were the focus of Jones' threatened prosecution. Websites that advocated vote swapping without actually enabling visitors to swap votes were never targeted.

party candidates and concern that winner-take-all systems might allow a candidate to receive all of a state's electoral votes even though he was opposed by a majority of the state's voters (as measured by the popular vote).[9] Any person who sought access to the mechanisms would have realized — even turning a blind eye to the text and hyperlinks that surrounded them on the websites — that their creators supported third parties and were seeking to create options that were otherwise foreclosed by most states' electoral procedures. A user of voteswap2000.com's mechanism who self-identified as a safe-state Gore supporter, for example, would have been asked to provide his or her name and e-mail address, and would have seen the following language on the online sign-up page: "You are a Gore supporter from a blow-out state who will agree to vote for Nader in exchange for someone in a swing state voting for Gore." This statement certainly communicated voteswap2000.com's pro-Nader, pro-Gore position, as well as its fear that Bush would win swing states' electoral votes despite the opposition of a majority of the states' voters. *See Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (expressive conduct requires "intent to convey a particularized message" and "likelihood [that is] great that the message would be understood by those who viewed it"); *cf. Vlasak v. Superior Court*, 329 F.3d 683, 690-91 (9th Cir. 2003) (protester's wood-and-metal bull hook at circus was expressive conduct); *Colacurcio v. City of Kent*, 163 F.3d 545, 549-50 (9th Cir. 1998) (same for nude dancing at nightclub).[10]

---

[9]Voteswap2000.com's message was even more specific. Because its vote-swapping mechanism permitted only self-identified safe-state Gore supporters to trade votes with swing-state Nader supporters, the message conveyed was support for Nader (as opposed to third parties generally) and for Gore.

[10]The Supreme Court's recent decision in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* (*FAIR*), 126 S. Ct. 1297 (2006), is not to the contrary. The Court held in *FAIR* that law schools' exclusion of military recruiters from campus was not expressive conduct because "[a]n

**[6]** Looking next at the communication and vote swaps that the mechanisms enabled between paired users, we agree with Appellants that they too constituted protected speech or conduct.[11] As discussed above, after being matched by the websites' vote-swapping mechanisms, users were encouraged to contact each other by e-mail. It is reasonable to assume that the users' ensuing messages would have concerned their political preferences and, if the users reached a meeting of the minds, resulted in agreements to swap votes on election day. This kind of communication is clearly protected by the First Amendment. "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," including "discussions of candidates." *Mills v. Alabama*, 384 U.S. 214, 218 (1966); *see also Meyer v. Grant*, 486 U.S. 414, 422 (1988) ("[I]nteractive communication concerning political change . . . is appropriately described as 'core political speech.' "); *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) ("Discussion of public issues and

---

observer . . . has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." *Id.* at 1311. Here, in contrast, an observer who came across the websites' vote-swapping mechanisms would in all likelihood have discerned their message of support for third parties, concern about elections featuring multiple candidates and conducted under a winner-take-all regime and (in voteswap2000.com's case) support for Nader and Gore.

[11]Cody and Porter, the owners of voteswap2000.com and votexchange2000.com, may not have standing to assert this First Amendment interest since there is no indication that they planned to *use* their websites' vote-swapping mechanisms. However, Kerr and Lewis, both of whom were interested in swapping votes through the websites but were unable to do so after the vote-swapping mechanisms were disabled, plainly do have the requisite standing. *See Buono v. Norton*, 371 F.3d 543, 548 (9th Cir. 2004) (noting that in a federal case involving multiple plaintiffs, "once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others") (quoting *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993)) (internal quotation marks omitted).

debate on the qualifications of candidates are . . . . afford[ed] the broadest protection . . . .").

**[7]** Any agreements that paired users may have reached about swapping votes were also constitutionally protected. Such agreements — like the e-mails that preceded them — involved people's opinions on "campaigns for political office," which are precisely where the First Amendment "has its fullest and most urgent application." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). Agreements whereby a swing-state third-party supporter and safe-state major-party supporter pledged to trade votes also would have expressed those voters' (1) support for a particular major-party candidate or (2) support for a particular third-party candidate, as well as (3) their concern that unless action was taken, the winner-take-all electoral system could result in the will of the swing state's popular-vote majority being overridden.

**[8]** Whatever the wisdom of using vote-swapping agreements to communicate these positions, such agreements plainly differ from conventional (and illegal) vote buying, which conveys no message other than the parties' willingness to exchange votes for money (or some other form of private profit). The Supreme Court held in *Brown v. Hartlage*, 456 U.S. 45, 55 (1982), that vote buying may be banned "without trenching on any right of association protected by the First Amendment." Vote swapping, however, is more akin to the candidate's pledge in *Brown* to take a pay cut if elected, which the Court concluded was constitutionally protected, than to unprotected vote buying. Like the candidate's pledge, vote swapping involves a "promise to confer some ultimate benefit on the voter, *qua* . . . citizen[ ] or member of the general public" — i.e., another person's agreement to vote for a particular candidate. *Id.* at 58-59. And unlike vote buying, vote swapping is not an "illegal exchange for *private* profit" since the only benefit a vote swapper can receive is a marginally higher probability that his preferred electoral outcome will come to pass. *Id.* at 55 (emphasis added); *cf.* Marc John

Randazza, *The Other Election Controversy of Y2K: Core First Amendment Values and High-Tech Political Coalitions*, 82 Wash. U. L.Q. 143, 221 (2004) ("There can be no . . . serious assertion, that anyone entered into a vote-swap arrangement for private profit or any other form of enrichment.").

Both the websites' vote-swapping mechanisms and the communication and vote swaps that they enabled were therefore constitutionally protected. At their core, they amounted to efforts by politically engaged people to support their preferred candidates and to avoid election results that they feared would contravene the preferences of a majority of voters in closely contested states. Whether or not one agrees with these voters' tactics, such efforts, when conducted honestly and without money changing hands, are at the heart of the liberty safeguarded by the First Amendment. *Cf. Brown*, 456 U.S. at 52-53; *Buckley*, 424 U.S. at 14-15; *Monitor Patriot*, 401 U.S. at 271-72; *Mills*, 384 U.S. at 218-19.[12]

We do not decide, however, whether the vote-swapping mechanisms and the communication and vote swaps they made possible were pure speech or expressive conduct. The distinction between the two concepts is often difficult to discern. *See, e.g.*, *FAIR*, 126 S. Ct. at 1308-11 (considering law schools' policies toward military recruiters first as speech and then in the alternative as expressive conduct). It is also a distinction that makes no practical difference here, because our conclusion would be the same under the strict scrutiny that applies to restrictions of pure speech as it is under the intermediate scrutiny applicable to the burdening of expressive conduct that we employ below.[13]

---

[12]The Secretary essentially conceded at oral argument that agreements between individuals to swap votes, when made without the use of a website or other enabling mechanism, are not illegal under California law. If this is so, the rationale for criminalizing vote swap mechanisms becomes even more problematic.

[13]We thus do not address Appellants' contention that their "websites engaged in and facilitated [pure] political speech and association" and

### 2. *Intermediate scrutiny under* United States v. O'Brien

**[9]** A government action that burdens expressive conduct is subject to intermediate scrutiny, and is upheld if (1) "it is within the constitutional power of the Government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). The government "bears the burden of proving that the elements of the *O'Brien* test are satisfied." *Preferred Commc'ns, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1406 n.9 (9th Cir. 1985). Applying this framework, we hold that the State's legitimate interests did not support Jones' threatened criminal prosecution of the owners of voteswap2000.com and votexchange2000.com.[14]

---

hence were not merely expressive conduct. We also note that the Secretary argues that the vote-swapping mechanisms were conduct rather than speech without considering the possibility that they were protected *expressive* conduct. Furthermore, the Secretary's assertion that vote swapping is constitutionally unprotected because it is allegedly illegal under California law is a non sequitur. The constitutional status of a given activity is not determined by its legality under state law; indeed, a statute that proscribes a protected activity may for that reason be held unconstitutional.

[14]If we treated the vote-swapping mechanisms and the communication and vote swaps that they enabled as speech rather than expressive conduct, strict scrutiny would be applicable. *See Meyer*, 486 U.S. at 420-22 (limitation on core political speech subject to "exacting scrutiny"); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (election law that severely restricts First Amendment rights subject to strict scrutiny); *cf.* Randazza, *supra*, at 219 ("The secretaries of states' actions . . . implicate core First Amendment values to such an extent that strict scrutiny must apply."); John M. Rushing, *Vote Swapping and Free Speech: Voice, Politics, and Choice*, 7 Tex. F. on C.L. & C.R. 73, 77 (2002) (same). Because Jones' threatened prosecution of the websites' owners fails to survive intermediate scrutiny, it necessarily follows that it would also be invalid under strict scrutiny.

The Secretary asserts three interests to justify any alleged burdening of Appellants' protected activity: preventing corruption, preventing fraud and preventing the subversion of the Electoral College.[15] Because the concepts of corruption and fraud are related although distinct, we consider California's interest in preventing elections from being tainted by illicit financial transactions under the corruption rubric, and its interest in preventing deceptive campaign practices under the fraud rubric. *See Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.* (*NCPAC*), 470 U.S. 480, 497 (1985) ("The hallmark of corruption is the financial *quid pro quo*: dollars for political favors."); *Buckley*, 424 U.S. at 27 ("[T]he appearance of corruption stem[s] from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions."); *see also Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) (equating fraud with "public deception"). Regardless of how they are categorized, these interests embody the Secretary's understandable unease, as chief elections officer of California, with novel online applications that were perceived as threatening state and national electoral procedures and appeared to be susceptible to fraudulent activity.

Beginning with the first *O'Brien* prong, we have no doubt that Jones had the constitutional authority to threaten the websites' owners with prosecution. California's police power

---

[15]The Secretary also hints at a fourth interest: preventing vote swapping per se, even if carried out non-corruptly, non-fraudulently and on a small scale. Such an interest, whether it is distinct or subsumed into the State's anti-corruption interest, is invalid given our conclusion above that vote swapping is a constitutionally protected activity. Even under intermediate scrutiny, the government's interest in burdening expressive conduct must be something other than a desire to impose that very burden. *See O'Brien*, 391 U.S. at 377 ("[T]he governmental interest [must be] unrelated to the suppression of free expression . . . ."). Moreover, such a per se rule is inconsistent with the Secretary's concession at oral argument that individual vote swaps carried out without the use of an enabling mechanism are not unlawful. *See* n.8, *supra*.

plainly authorizes state officials to send cease-and-desist letters to websites that are believed to be in violation of an otherwise valid statute, and to prosecute the websites' owners for their offenses. *See United States v. Turkette*, 452 U.S. 576, 587 n.9 (1981) ("States [are] free to exercise their police powers to the fullest constitutional extent in defining and prosecuting crimes within their respective jurisdictions.").

**[10]** The second *O'Brien* prong, whether Jones' actions furthered important or substantial government interests, presents a question with mixed answers. Preventing corruption and preventing fraud have both been repeatedly recognized as weighty government interests. *See, e.g.*, *Fed. Election Comm'n v. Wisconsin Right to Life, Inc. (WRTL)*, 127 S. Ct. 2652, 2672 (2007) (*WRTL*) ("[T]he Court has long recognized the governmental interest in preventing corruption and the appearance of corruption in election campaigns.") (internal quotation marks omitted); *Village of Schaumburg*, 444 U.S. at 636 ("protecting the public from fraud" is "indeed [a] substantial" interest) (internal quotation marks omitted). However, as Appellants argue, no decision has ever recognized a state's interest in preventing the subversion of the Electoral College, let alone characterized such an interest as important or substantial. *Cf. Williams v. Rhodes*, 393 U.S. 23, 28-29 (1968) (rejecting Ohio's asserted interest under art. II, § 1 of the Constitution in keeping minority parties off the presidential ballot). In any event, we need not decide whether preventing the subversion of the Electoral College is a legitimate government interest because, as we discuss below, even if it were, it was not furthered by Jones' actions.

The third *O'Brien* requirement, that the state's interests be unrelated to the suppression of free expression, is easily satisfied here. The prevention of fraud, corruption and Electoral College subversion is conceptually distinct from the abridgement of speech. *Cf. R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 396 n.8 (1992) ("State's compelling interest in preventing . . . election fraud" is an "interest[ ] unrelated to the sup-

pression of ideas"). Moreover, there is no indication here that Jones threatened to prosecute Appellants because of their political views, and the fact that he did not send cease-and-desist letters to websites that advocated vote swapping but did not include vote-swapping mechanisms suggests strongly that his motivation was not the suppression of speech.

Finally, we examine separately each of the Secretary's three asserted interests to determine whether the fourth and most important *O'Brien* prong was satisfied — that the incidental restrictions on First Amendment freedoms be no greater than is necessary to further those interests. We conclude that the Secretary's interests in preventing corruption and preventing the subversion of the Electoral College were not furthered at all by the threatened prosecution of the owners of voteswap2000.com and votexchange2000.com, and that the State's anti-fraud interest was not addressed in a sufficiently tailored manner.

**[11]** a. *Corruption*. Beginning with the State's anti-corruption interest, we reiterate that we construe this interest to encompass only the prevention of illicit financial transactions such as the buying of votes or the contribution of large sums of money to legislators in exchange for political support. *See WRTL*, 127 S. Ct. at 2676 (Scalia, J., concurring in part and concurring in the judgment); *NCPAC*, 470 U.S. at 497; *Buckley*, 424 U.S. at 26-27. So defined, this interest was not advanced by the threatened prosecution of the owners of voteswap2000.com and votexchange2000.com. The websites did not encourage the trading of votes for money, or indeed for anything other than other votes. Votexchange2000.com actually included a notation that "It *is* illegal to pay someone to vote on your behalf, or even get paid to vote yourself. Stay away from the money. Just vote" (emphasis in original). And there is no evidence in the record, nor has the Secretary argued, that any website users ever misused the vote-swapping mechanisms by offering or accepting money for their votes.

**[12]** b. *Fraud.* The state's anti-fraud interest *was* furthered by Jones' threatened prosecution of the website owners. At least three kinds of fraud could have been perpetrated through those websites' vote-swapping mechanisms. People from other states (or even other countries) could have pretended to be third-party swing-state supporters or major-party safe-state supporters. Regardless of their location, people could have used the websites' vote-swapping mechanisms multiple times, thus trading their one vote (or zero votes) for several other votes. And even people who were truthful about their location and who only swapped votes once could have deliberately misrepresented their voting intentions. Threatening Appellants' websites with prosecution unless they disabled the vote-swapping mechanisms thus served the State's anti-fraud interest for the obvious reason that none of the above species of fraud could have been committed through mechanisms that were no longer in operation.

**[13]** However, the Secretary has failed to demonstrate that the burden imposed on constitutionally protected activity by the disabling of the mechanisms was not "greater than [was] essential to the furtherance of [the State's anti-fraud] interest." *O'Brien*, 391 U.S. at 377. First, the Secretary has not called our attention to, nor have we been able to locate, any evidence in the record that fraud actually took place during the brief period that the vote-swapping mechanisms were operational. No website users came forward with either admissions that they committed fraud or worries that their counterparts misrepresented their state of residency or voting intentions. The websites' owners also did not notice any suspicious online activity, such as the use of "obviously fake or multiple e-mail addresses," which voteswap2000.com stated it would try to eliminate if it occurred.

**[14]** Second, as described above, both websites repeatedly warned users that fraud was possible and advised them to take steps to reassure themselves that they could trust their matched counterparts. Voteswap2000.com told users to "[u]se

your own good judgement [sic] to determine if the person you are matched with is legitimate, and be aware that some people will try to abuse this system." Similarly, votexchange2000.com recommended that users "take some reasonable measures to insure that you could trust the other person." The Secretary has not explained why these warnings were insufficient, or what kind of language (if any) would have assuaged the State's concerns.

**[15]** Third, the manner in which the vote-swapping mechanisms operated reduced the opportunities for widespread fraud. Any would-be fraudster would have had to exchange e-mails and come to a vote-swapping agreement separately with each intended victim. There was no way to "automate" the fraud, that is, to agree to trade votes without first making e-mail contact and offering specific representations (even if bogus) to the other party about the fraudster's identity, location and voting intentions.

**[16]** Lastly, the Secretary has failed to establish (or, indeed, even to argue) that the State's anti-fraud interest could not have been advanced as effectively through less restrictive means. Under our case law, it was the Secretary's burden to show that the potential types of fraud the Secretary suggests might occur could not have been halted through measures less burdensome than the complete disabling of the websites' vote-swapping mechanisms. *See Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001); *Preferred Commc'ns*, 754 F.2d at 1406 n.9. The Secretary, however, did not attempt to make such a showing, even though it was the Secretary who invoked the *O'Brien* framework to justify shutting down the vote-swapping mechanisms. Given the Supreme Court's repeated admonishments that the government's interest in preventing fraud does not justify sweeping restrictions on constitutionally protected activity, the Secretary's failure to establish that Jones' actions were his only reasonable recourse is fatal to the Secretary's reliance on *O'Brien*. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,

487 U.S. 781, 800 (1988) ("In contrast to the prophylactic, imprecise, and unduly burdensome rule the State has adopted to reduce its alleged donor misperception, more benign and narrowly tailored options are available."); *Village of Schaumburg*, 444 U.S. at 637 ("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation."); *cf. NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.") (internal citations omitted).

Our conclusion is bolstered by Appellants' offer of at least two suggestions for preventing fraud short of disabling the websites' vote-swapping mechanisms altogether, neither of which was addressed by the Secretary. First, Appellants pointed out that "[m]ore stringent warnings" about the danger of fraud could have been posted on the websites, to even more clearly alert users of the need to exercise good judgment in trusting someone known only through the Internet. Second, the State could have "pass[ed] a law that said you must be who you say you are when you do this, you must be from the state you say you're from." If those who utilized the vote-swapping mechanism had been required by law (or even simply the websites) to prove their identity and residency before they could have been matched with other users (perhaps by providing information such as a driver's license number or the voter registration number that is typically listed on voter identification cards), then the websites could have stopped users from swapping votes multiple times or from misrepresenting their state of residency. Although the record does not conclusively demonstrate the feasibility or effectiveness of such verification methods, it was the State's burden to rebut Appellants' suggested lesser alternatives and the Secretary did not do so.

**[17]** c. *Electoral College*. Finally, the State's interest in preventing the subversion of the Electoral College, assuming

it to be a legitimate interest, was not furthered by Jones' actions. As a technical matter, Appellants are correct that the vote-swapping mechanisms did not enable users to cast their votes in states in which they were not registered, nor could the constitutionally prescribed arrangement for selecting the President have been undermined by the mechanisms. More fundamentally, the whole point of voteswap2000.com and votexchange2000.com was to prevent the preferences of a majority of a state's voters from being frustrated by the winner-take-all systems in place in most states. For example, in a hypothetical swing state with 49 percent Bush supporters, 48 percent Gore supporters, and 3 percent Nader supporters (all of whom we hypothesize preferred Gore to Bush), an election conducted without vote swapping would have resulted in a Bush victory even though he was not the first choice of a majority of the state's voters. However, if all the Nader supporters had swapped their votes with Gore supporters in safe states, then Gore — who was preferred by 51 percent of the state's voters to Bush — would have prevailed. Such an outcome would not have represented a subversion of the Electoral College, which would have continued to operate precisely as set forth in the Constitution. It also would not have undermined the state's electoral system, which would have still allocated all of the state's electoral votes to the candidate who received a plurality of the state's popular vote. All that the vote swapping would have done would have been to offset the anomalies that its advocates believe can result when more than two candidates face off in winner-take-all systems. *Cf.* Rushing, *supra*, at 88 ("[I]t is doubtful that the electoral college tenders a compelling state interest for ending vote swapping.").

**[18]** We therefore hold that Jones' threatened prosecution of the owners of voteswap2000.com and votexchange2000.com was unconstitutional under the fourth *O'Brien* prong. His actions severely burdened activity protected by the First Amendment; after October 30, 2000, the websites' vote-swapping mechanisms were entirely disabled,

and people were entirely unable to communicate or swap votes through the mechanisms. Moreover, his actions did not advance California's interests in preventing corruption and preventing the subversion of the Electoral College, and the Secretary has failed to establish that the State's anti-fraud interest could not have been furthered as effectively through measures less drastic than the complete disabling of vote-swapping mechanisms at issue here.[16] We express no opinion on whether less severe measures — such as the verification methods suggested by Appellants — would pass muster under *O'Brien*.

## C.   Qualified immunity

Appellants seek not only prospective relief from prosecution on account of their websites' vote-swapping mechanisms, but also damages from Jones. Jones, in turn, argues that he is entitled to qualified immunity. We have already addressed the first element of the qualified immunity inquiry, namely whether Jones violated Appellants' constitutional rights, which he did. *See Saucier*, 533 U.S. at 201. We therefore turn to the second element of the qualified immunity inquiry — whether the constitutionality under the First Amendment of

---

[16]Though *Brown v. Hartlage*, 456 U.S. 45 (1982), is not directly on point because it involved candidate-voter rather than voter-voter communication, it generally supports our conclusion. The Court held in *Brown* that a state could not bar a candidate from promising voters that he would take a pay cut if elected to office. While recognizing that "illegal exchange[s] for private profit . . . may properly be prohibited," *id.* at 55, the Court made clear that most communication and negotiation surrounding the exercise of the franchise cannot be banned. In the Court's words, "[t]he fact that some voters may find their self-interest reflected in a candidate's commitment does not place that commitment beyond the reach of the First Amendment." *Id.* at 56. In one respect, moreover, this case is easier than *Brown* because it does not involve any financial self-interest whatsoever. The voters in *Brown* could have expected to receive some (small) pecuniary advantage from the promised salary-saving. Here, in contrast, people agreed to swap votes without any promise at all of financial benefit.

halting vote swapping was clearly established in 2000. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (stating the "salient question" as "whether the state of the law . . . gave respondents fair warning that their [actions were] unconstitutional"); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (holding that a right is clearly established when its "contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right").

**[19]** We conclude that the application of First Amendment doctrine to vote swapping was not clearly established in 2000 (or, indeed, until our decision today). First, no court had ever addressed the constitutionality of efforts to halt vote swapping when Jones threatened Appellants with prosecution. Jones therefore had no on-point decision to rely on when he received complaints about Appellants' websites. Second, although it is true that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope*, 536 U.S. at 741, this case does not involve the mere application of settled law to a new factual permutation. To the contrary, we have had to wrestle with difficult and unsettled questions about the First Amendment interests implicated by vote swapping and the weight of the countervailing interests asserted by the State. Finally, Jones was not the only Secretary of State to determine that vote swapping was illegal under state law; so too did his counterparts in Oregon and Minnesota, on grounds similar to those cited by Jones (though the Secretaries of State of Maine, Michigan and Nebraska reached the opposite conclusion).

**[20]** Taking these considerations into account, we hold that Jones is entitled to qualified immunity. He did not have "fair warning" that his actions were unconstitutional, *id.* at 740, nor would a "reasonable official" in his position have understood that threatening the owners of vote-swapping websites with prosecution constituted a violation of the First Amendment, *Anderson*, 483 U.S. at 640.

## IV.  CONCLUSION

We hold that this case is not moot. The Shelley letter did not make it absolutely clear that California would not threaten to prosecute the owners of vote-swapping websites in the future. We further hold that Jones violated the First Amendment when he threatened to prosecute the owners of voteswap2000.com and votexchange2000.com. Both the websites' vote-swapping mechanisms and the communication and vote swaps that the mechanisms enabled were constitutionally protected. The heavy burden Jones imposed on this protected activity did not further the State's interests in preventing corruption and preventing the subversion of the Electoral College, and the Secretary failed to establish that the State's anti-fraud interest could not have been advanced as effectively through less severe measures. Nonetheless, we hold that Jones is entitled to qualified immunity because the constitutionality of halting vote swapping was not clearly established in 2000. The parties shall bear their own costs on appeal.

**AFFIRMED IN PART AND REVERSED IN PART.**