# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALAN PORTER; PATRICK KERR;
STEVEN LEWIS; WILLIAM J. CODY,
    *Plaintiffs-Appellants,*

v.

DEBRA BOWEN,* in her official
capacity as California Secretary of
State; BILL JONES, in his individual
capacity,
    *Defendants-Appellees.*

No. 06-55517

D.C. No.
CV-00-11700-RJK
Central District
of California,
Los Angeles

ORDER

Filed March 13, 2008

Before: Raymond C. Fisher and Richard R. Clifton,
Circuit Judges, and Ricardo S. Martinez, District Judge.**

Order;
Dissent by Judge Kleinfeld

---

## ORDER

Judges Fisher and Clifton voted to deny the petition for rehearing en banc and Judge Martinez so recommends.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the

---

*Debra Bowen is substituted for her predecessor, Bruce McPherson, as Secretary of State, pursuant to Fed. R. App. P. 43(c)(2).

**The Honorable Ricardo S. Martinez, United States District Judge for the Western District of Washington, sitting by designation.

votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing en banc, filed August 27, 2007, is denied.

Judge Kleinfeld's dissent from denial of rehearing en banc is filed concurrently herewith.

---

KLEINFELD, Circuit Judge, with whom Circuit Judges O'SCANNLAIN and BEA join, dissenting from denial of rehearing en banc:

I respectfully dissent.

This case is about whether the First Amendment protects from prosecution people who buy votes. Instead of cash, or beer and cigars, the buyers offered promises. The special twist, a very important one, was that the purpose of the scheme was to effectuate what amounted to people voting in states other than their own. The not very special twist is that instead of standing around the polling place to buy votes, or chartering buses to bring voters to other states, the scheme used internet sites to enable people to exchange promises. The deals were in the form, "if you promise to vote for my preferred candidate in your state, I will promise to vote for your preferred candidate in my state."

During the 2000 election, Porter and the other plaintiffs set up internet sites, votexchange2000.com and voteswap 2000.com, to facilitate vote swapping agreements.[1] The vote swap2000.com site said that its purpose was " '[t]o maximize the percentage of the popular vote that Nader receives, yet

---

[1]*Porter v. Bowen*, 496 F.3d 1009, 1012 (9th Cir. 2007).

allow Gore to win the national election.' "[2] While voteswap2000.com targeted "[o]nly swing-state Nader supporters and safe-state Gore supporters,"[3] at votexchange 2000.com "*any* third-party supporter in a swing state could be matched with an appropriate major-party supporter in a safe state."[4]

The Secretary of State of California sent a letter to the voteswap2000.com owners threatening criminal prosecution under several California statutes relating to voting fraud and conspiracy.[5] The central one prohibits anyone from making a "*promise* to pay . . . any money *or other valuable consideration* to . . . induce any voter to . . . vote for . . . any particular person."[6] In response, both the websites disabled their mechanisms for facilitating the exchanges of promises.[7] This evidently satisfied the Secretary of State, and no one was prosecuted.[8]

Our panel decision holds that by sending the letter threatening criminal prosecution, the Secretary of State "violated Appellants' First Amendment rights."[9] The theory seems to be that the sites expressed support for candidates, and the agreements they facilitated "involved" political opinions, so the solicitations were constitutionally protected speech.[10]

---

[2]*Id.* at 1013 (alteration in original). Cash is available from the federal government for a candidate who gets five percent of the national popular vote. *See* 26 U.S.C. § 9004(a)(2)(B).

[3]*Id.*

[4]*Id.* at 1014 (emphasis in original).

[5]*Id.* at 1014-15.

[6]Cal. Elec. Code § 18522 (emphasis added).

[7]*Porter v. Bowen*, 496 F.3d 1009, 1015 (9th Cir. 2007).

[8]*Id.*

[9]*Id.* at 1013.

[10]*See id.* at 1018-20.

My disagreement with the panel opinion comes down to a syllogism: (1) vote buying is not protected by the First Amendment;[11] (2) vote swap agreements are vote buying; so (3) vote swapping agreements are not protected by the First Amendment.

There is not much precedent on point, because few have had the chutzpah to argue that buying promises to vote for someone, or arranging for them, would be constitutionally protected. *Brown v. Hartlage*,[12] the only case relied upon by the panel, says the opposite of what the panel decision uses it for.

In *Brown*, the Supreme Court says[13] that the First Amendment does not shield speech to buy votes. The Court's language goes beyond the simple money-for-vote exchange, to exclude from First Amendment protection agreements for exchanges, and agreements for things of value other than money:

> [A] State may surely prohibit a candidate from buying votes. No body politic worthy of being called a democracy entrusts the selection of leaders to a process of auction or barter. And as a State may prohibit the giving of money or other things of value to a voter in exchange for his support, it may also declare

---

[11]*See Brown v. Hartlage*, 456 U.S. 45, 54-55 (1982).

[12]*Id.*

[13]The comments may be dicta. Our practice, of course, is to treat Supreme Court dicta with "due deference," *e.g.*, *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1058 n.1 (9th Cir. 2004) (quoting *United States v. Baird*, 85 F.3d 450, 453 (9th Cir. 1996)), because it serves as a " 'prophecy of what that Court might hold,' " *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) (quoting *Zal v. Steppe*, 968 F.2d 924, 935 (9th Cir. 1992) (Noonan, J., concurring and dissenting)).

> unlawful an agreement embodying the intention to make such an exchange.[14]

What the Court held to be unprotected is what we have in this case: a scheme to facilitate the exchange of something valuable, a promise, in exchange for a vote. The difference between the vote swapping scheme here and more traditional vote buying is that instead of one side to the transaction buying the vote and the other selling it, both are buying and both are selling.

*Brown* also speaks explicitly to the argument that the vote buying is mere words and not conduct. "The fact that [a vote buying] agreement necessarily takes the form of words does not confer upon it, or upon the underlying conduct, the constitutional immunities that the First Amendment extends to speech."[15]

The exchange of promises is an ordinary means of making a contract, whether legal or illegal, and no one has doubted for centuries that promises form consideration for contracts. Contracts are how people buy things of value, sometimes promises to sell goods in exchange for promises to pay, promises of quantity discounts, or, as in this case, promises to vote for the other person's preferred candidate. The panel considered it important that the vote-swaps operated "without money changing hands,"[16] but a promise is consideration whether it involves cash or not.[17] The California statutes, like those of all the other states in this circuit, prohibit vote buying for consideration other than money, as well as for cash.[18] Of

---

[14]*Id.* at 54-55.

[15]*Id.* at 55.

[16]*Porter v. Bowen*, 496 F.3d 1009, 1020 (9th Cir. 2007).

[17]Restatement (Second) Contracts § 71.

[18]*See* Alaska Stat. § 15.56.030; Ariz. Rev. Stat. Ann. §§ 16-1006, 16-1014; Cal. Elec. Code § 18522; Haw. Rev. Stat. § 19-3; Idaho Code Ann. § 18-2304, 18-2305; Mont. Code Ann. §§ 13-35-214, 13-35-215, 45-7-101; Nev. Rev. Stat. § 293.700; Or. Rev. Stat. § 260.665; Wash. Rev. Code §§ 29A.84.620, 29A.84.640.

course, the buyer of the vote may be cheated by secret non-performance of the promise he bought, and have no legal remedy, but a promise is good consideration even if the promise is unenforceable,[19] and even if it is "not binding or against public policy."[20]

The schemes stated their intentions, effectively to have the safe-state voters' preferred votes cast in the swing-states, and the swing-state voters' preferred votes cast in the safe-states. Our Constitution requires that electoral votes be cast state-by-state, not that the President be elected by plurality or majority of the nationwide popular vote.[21] Some people think that is a bad idea, and some think that is a good idea, both for neutral reasons such as isolating disputes to individual states, and also for policy reasons, such as enhancing the power of big states.[22] Whether the electoral college and winner-take-all casting of electoral votes is a good idea or not has no bearing on the law. Article II, section 1 and the Twelfth Amendment are the Con-

---

[19]Restatement (Second) Contracts § 78.

[20]*Id.* at § 78 cmt. a.

[21]*See* U.S. Const. art. II, § 1; *id.* at amend. XII; *see also Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68-69 (1978); *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169 (9th Cir. 2001); *Millsaps v. Thompson*, 259 F.3d 535 (6th Cir. 2001).

[22]"Formally," the Constitution's method of apportioning electors "malapportions the electoral college in favor of the small states," but the "unit rule," that is, the winner-take-all approach traditionally used by the states to cast electoral votes, makes this malapportionment "for the most part only apparent, not in practice real." Alexander M. Bickel, *The Electoral College, in* Presidential Politics: Readings on Nominations and Elections, 280, 281 (James I. Lengle & Byron E. Shafer eds., 2d ed. 1983). This transforms a small gain in a state's popular vote into a large number of electoral votes. That is, "to carry New York, or Illinois, or California, or Texas by 50,000, or even 5,000, popular votes is to win a much larger number of electoral votes than could be gained by getting great popular majorities in any number of small states." *Id. See also* Nelson W. Polsby & Aaron Wildavsky, Presidential Elections: Strategies of American Electoral Politics 246 (5th ed. 1980) ("But it is primarily the larger states, through the unit rule principle, who benefit from the Electoral College.").

stitution we have. State-by-state voting is the system for which they provide. The First Amendment does not prevent state prosecution of those who subvert it by making arrangements effectively to cast votes in other states.

Supreme Court "cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders."[23] All the states in our circuit restrict the franchise to their own citizens.[24] There is a lot of history explaining why. The Founding Fathers doubtless could not have put together our constitutional union without reserving this power to the states. Nor did the importance of state-by-state voting end after ratification. The decade before the Civil War had its own smaller civil war in what was then called "Bleeding Kansas." A United States Senator from Missouri "led an invasion of 'border ruffians' into Kansas to swell the vote for the proslavery candidate" in the 1854 territorial election.[25] Voting fraud by Missourians crossing the border to vote for slavery in the Kansas Territory, terrorism by proslavery and antislavery guerrillas, and two competing state legislatures, led contemporary observers to write of "the anarchy and terrorism resulting from massive voting fraud in 'Bleeding Kansas' by pro-

---

[23]*Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68-69 (1978); *see* U.S. Const. art. I, § 4, cl. 1; *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (explaining that the Constitution "confers on the states broad authority to regulate the conduct of elections, including federal ones"); *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000) ("[A] state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject.").

[24]*See* Or. Const. art. II § 2; Alaska Stat. § 15.05.010; Ariz. Rev. Stat. Ann. § 16-101; Cal. Elec. Code § 2000; Haw. Rev. Stat. §§ 11-11, 11-13, 11-15; Idaho Code Ann. § 34-402; Mont. Code Ann. § 13-1-111; Nev. Rev. Stat. § 293.485; Wash. Rev. Code §§ 29A.04.210, 29A.08.220, 29A.08.230.

[25]James M. McPherson, Battle Cry of Freedom: The Civil War Era 146 (1988).

slavery voters from Missouri crossing the border to counter pro-abolition voters from New England."[26] The Civil War changed our Constitution quite a lot,[27] but no change was made to the Electoral College or state-by-state voting, and no change has been made since.[28]

In *Brown v. Hartlage*,[29] a candidate for county commissioner in Kentucky promised that if elected, he would cut county commissioners' salaries, including his own.[30] He won.[31] The Kentucky courts held that this was vote-buying, and voided the election on the theory that buying votes by promising to cut salaries (and thereby enrich taxpayers) violated the state's Corrupt Practices Act.[32] This decision was, unsurprisingly, overturned by the Supreme Court. The theory for overturning it was that the kind of promise the tax-cut candidate made was of the sort "universally acknowledged to be legitimate,"[33] even though it amounted to a commitment to leave more money in voters' pockets if the promise was performed. This is the authority the panel relies on for its view that the First Amendment shields solicitations for vote swapping agreements.

The reason why the candidate's promise was legitimate was

---

[26]*See Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173 (9th Cir. 2001). "At the first [Kansas] election armed Missourians overawed the polls in nearly every precinct, and chose a legislature composed of non-resident slaveholders. Bloodshed soon followed." Albert D. Richardson, Beyond the Mississippi 41 (1867).

[27]*See* U.S. Const. amend. XIII, XIV, XV.

[28]No change, that is, relevant to the issues in this case. The Twenty-third Amendment gave the District of Columbia electoral votes. *See* U.S. Const. amend. XXIII.

[29]456 U.S. 45 (1982).

[30]*Id.* at 48.

[31]*Id.* at 49.

[32]*Id.* at 51-52.

[33]*Id.* at 55.

that it amounted to a promise to govern in a particular way, not to give voters something privately in exchange for their votes. The Court explained that the distinction was between a benefit a voter would get "through the normal processes of government," and a benefit a voter would get "through some private arrangement":

> We have never insisted that the franchise be exercised without taint of individual benefit; indeed, our tradition of political pluralism is partly predicated on the expectation that voters will pursue their individual good through the political process, and that the summation of these individual pursuits will further the collective welfare. *So long as the hoped-for personal benefit is to be achieved through the normal processes of government, and not through some private arrangement*, it has always been, and remains, a reputable basis upon which to cast one's ballot.[34]

By contrast, the case at bar does not involve any promise by a candidate to govern in a particular way. Instead, the scheme was just what *Brown* says is not constitutionally protected speech: the solicitation of private arrangements to evade the "normal processes of government."[35]

Fortunately, crossing state lines to flood another state's election no longer involves an armed invasion, as when Missourians invaded the Kansas Territory. Unfortunately, the ease and economy with which it can be done on the internet makes it a lot more likely than when it was more burdensome. The vote swapping schemes at issue enable a large state safe for one candidate to flood smaller states with votes that the smaller states' voters would not have made but for private promises. Now that our panel opinion wraps a First Amendment blessing around exchanges of promises to vote for each

---

[34]*Id.* at 56 (emphasis added) (footnote omitted).

[35]*Id.*

others' candidates, the desirable chilling effect laws against vote buying have on schemes to buy votes this way is gone. We can expect a lot more of it.

If people in one state want people in another state to vote a particular way, they can go there and ring doorbells, send them letters, buy advertisements on their media, publicize arguments on the internet, and otherwise explain to them why they ought to vote a particular way. But they do not have a constitutional right to buy their votes, with money or promises.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2008 Thomson/West.